137 P.3d 809 (2006)
2006 UT 36
In the Matter of E.H., a minor child.
T.H., on her own behalf and as next of friend of minors T.H. and S.H., Respondent and Cross-Petitioner,
v.
R.C. and S.C. and Families for Children, Petitioners and Cross-Respondents.
No. 20050059.
Supreme Court of Utah.
June 6, 2006.
*811 Linda Faye Smith, Salt Lake City, for respondent.
Gregory P. Hawkins, Rick L. Sorensen, Lonn Litchfield, Murray, for petitioners.
Melvin G. Larew, Draper, for Families for Children.

On Certiorari to the Utah Court of Appeals
NEHRING, Justice:

INTRODUCTION
¶ 1 We granted certiorari to consider the custody of a young boy, E.H. In particular, we will review whether the court of appeals erred when it placed E.H. in the custody of his biological mother under the terms of a stipulation that the district court refused to enforce.
¶ 2 The parties are T.H., the birth mother, R.C. and S.C., the adoptive parents, and Families for Children, an adoption agency. The proceeding in this court is the latest, but sadly not the last, act in a very human saga that has played out on the stage of our courts. Despite our determination that we must remand this case for further proceedings, we hold fast to the hope that in the near future E.H. will know who his parents will be and where he will call home. This opinion speaks to the rules and procedures that will guide the courts and the parties toward the goal of at last providing E.H. with some measure of certainty and stability.
¶ 3 Our opinion has four focal points: (1) whether the stipulation assigning a psychologist the task of making recommendations concerning E.H.'s best interests was an impermissible delegation of authority to a third *812 party in order to determine the best interests of E.H., (2) whether the law of the case doctrine is relevant to review a district court's refusal to enforce the stipulation, (3) whether the district court erred in denying standing to the mother to challenge the adoptive parents' petition to adopt E.H., and (4) whether the district court made a clearly erroneous ruling when it determined that the mother's relinquishment of her parental rights was enforceable.

FACTUAL AND PROCEDURAL BACKGROUND
¶ 4 In 2000, T.H. was faced with an unplanned pregnancy. She contacted the Adoption Law Center (ALC) in California to help arrange the adoption of her unborn child. Concurrently, the adoptive parents hired Families for Children to perform a home study to determine whether they were eligible to adopt a child. Suzanne Stott, the director of Families for Children, performed the home study. She found that the adoptive parents met the necessary criteria to adopt a child.
¶ 5 On November 14, 2000, the adoptive parents, who are Caucasian, sent a letter to the ALC expressing their interest in adopting an African-American child. The letter contained information about their family, which the ALC later read to the mother during a telephone conversation. Thereafter, the ALC set up a telephone conversation between the mother and the adoptive parents. Based on this information, the mother selected the adoptive parents to be the adoptive family for her child.
¶ 6 Ten days later, on November 24, 2000, the birth mother, T.H., flew to Utah; she gave birth to E.H. on November 27, 2000. On November 29, 2000, she signed a document relinquishing all her parental rights and granting custody of the child to Families for Children.
¶ 7 T.H., together with her two other children, lived with the adoptive parents for approximately two and a half months after the birth of E.H. During her stay in Utah, the mother became concerned for the welfare of E.H. Her observations while residing in the adoptive parents' home were at odds with the statements made about the adoptive parents and their children by Families for Children. For example, she observed that the adoptive parents' children were not the honor students that she was led to believe they were. Moreover, they appeared to do little school work. The mother also became concerned about the social development of the adoptive parents' children, as they seemed to have no healthy social relationships outside the family. Based on her own observation, she concluded that the home study performed by Ms. Stott was inaccurate, incomplete, and incompetently prepared.
¶ 8 E.H.'s mother and other children moved out of the adoptive parents' home on February 15, 2001. Two months later, she filed a petition in which she sought the custody of E.H. In her petition, the mother alleged that her relinquishment of parental rights was acquired by duress. She alleged that the adoptive family made additional fraudulent misrepresentations in the relinquishment process. Within days of the filing of the mother's petition, the adoptive parents filed a petition for adoption and moved to dismiss the mother's petition. The two cases were consolidated with the parties' consent.
¶ 9 While cross-motions for summary judgment were pending, the parties entered into a stipulation. The central feature of the stipulation was an agreed-upon procedure to determine what custodial arrangement was most compatible with E.H.'s best interests. The parties agreed to select an independent clinical psychologist to "determine what custody arrangement or decree of adoption should be ordered and whether any order for visitation or other contact should also be entered in this case." Furthermore, the parties stipulated to be bound by the recommendations of the clinical psychologist and authorized the court to enter the recommendations as the judgment of the court without further proceedings. The district court judge to whom the consolidated cases were assigned entered an order approving the stipulation.
¶ 10 Under the terms of the stipulation, both the mother and the adoptive parents forfeited claims, granted concessions, and undertook *813 obligations. For example, the stipulation states:
[T.H.] having waived any right to proceed on her claim to set aside the relinquishment for fraud, constructive fraud, violation of procedures, breach of contract, or for any other good cause in light of the parties' Stipulation, it is hereby ordered that she shall not challenge the Judgment in this case or in the adoption case on the basis of such claims. [The adoptive parents] and Families for Children having waived any right to object to or challenge the propriety or enforceability of a Judgment for post-adoption contact in this case in light of the parties' Stipulation, it is hereby ordered that they shall not challenge such an order or Judgment for post-adoption contact should such an order or Judgment be recommended.
¶ 11 Seven months after entering into the stipulation, the parties agreed upon Dr. Chris Wehl, a clinical psychologist, to be the evaluator. Dr. Wehl took about one year to complete the evaluation. In his report, Dr. Wehl recommended that the petition for adoption be dismissed and that custody be granted to the mother. As contemplated by the stipulation, the mother then filed a motion to confirm Dr. Wehl's recommendations and grant custody immediately to her. The adoptive parents objected to the mother's motion. At the time these events occurred, E.H. was 28 months old.
¶ 12 By the time Dr. Wehl's recommendation was submitted to the court pursuant to the stipulation, the judge who entered the order approving the stipulation retired from the bench, and another judge had taken over the consolidated cases. It thus fell to the second judge to rule on the mother's contested motion to accept Dr. Wehl's recommendation and dismiss the adoptive parents' petition for adoption. The second judge apparently agreed with the adoptive parents that Utah Code section 78-30-4.16 (2000) required him to first determine whether the mother had relinquished her parental rights before he could commence any proceeding regarding the best interests of E.H. The second judge thereafter conducted a two-day hearing on the lawfulness of the mother's relinquishment. He determined that the mother was bound by the relinquishment. As we will see, this ruling proved to have considerable collateral consequences.
¶ 13 With the mother's relinquishment upheld, the adoptive parents moved ahead with their adoption petition. The mother sought to participate in the proceedings. She claimed that under the terms of the stipulation the adoptive parents had promised to dismiss their adoption petition and had therefore repudiated the stipulation by refusing to finalize the adoption of E.H. In any event, she claimed that the stipulation expressly contemplated a "best interests" hearing in which the mother could participate. Faced with the unfavorable recommendation of Dr. Wehl, the adoptive parents had, however, changed their position and now insisted that because the mother's relinquishment had been found to be valid, she had no standing to participate further in any proceeding concerning the best interests of E.H. The second judge agreed with the adoptive parents and ruled that the mother had no standing to participate in the adoption proceedings.
¶ 14 The court then conducted an adoption hearing. On its own motion, the court required Dr. Wehl to testify at the hearing. The adoptive parents were the only parties to the adoption proceedings. At the conclusion of the hearing, the district court voided the stipulation and granted the adoptive parents' petition, thus finalizing the adoption of E.H.
¶ 15 The mother appealed. The court of appeals reversed the district court's decision. It concluded that the district court did not have adequate justification to disregard the intent of the parties as expressed in the stipulation. The court of appeals therefore remanded the case to the district court with instructions to restore the custody of E.H. to his mother.

ANALYSIS
¶ 16 We postpone our exploration of the legal issues presented to us in this appeal to note our dismay that E.H. has been too long denied the permanence and stability to which *814 he is entitled. E.H. became the object of litigation within months of entering this world and continues to find his fate held in suspension by our courts well into his sixth year. It is an unfortunate reality that E.H. may be capable of reading the rulings of the courts, including this one, that will chart his custodial destiny as those rulings are issued.
¶ 17 By acknowledging E.H.'s misfortune, we do not intend to assign blame for it. Indeed, while the stipulation agreed upon by the parties now stands out prominently as the reason why the judicial process charged with determining E.H.'s parental and custodial status has careened off its intended course, the stipulation was, at its inception, well-intentioned. It appears to have emanated from a collective recognition that E.H.'s best interests would be served by putting in place a fair, objective, and streamlined procedure to determine the custodial placement that would be most compatible with E.H.'s best interests.
¶ 18 We are mindful that our ruling today fails E.H. in the sense that it does not bring finality to his status. We must not permit our concern for stability and finality, however, to displace our responsibility to correctly interpret the law governing the issues before us. With this in mind, we turn our attention to those issues.
¶ 19 The court of appeals concluded that the trial judge exceeded his discretion when he deviated from the stipulation, vacated the first judge's order giving effect to the stipulation, and found that the best interests of E.H. were served by granting the petition of the adoptive parents. We agree with the court of appeals that the stipulation should be examined using general contract principles and that, so examined, it is unassailable.[1] While we agree that the second judge erred when he declared the entire stipulation void, we do not believe that he was obliged to summarily enforce it, and to this extent, we depart from the court of appeals' decision. To explain our partial endorsement of the court of appeals' decision, we examine the stipulation and the adoptive parents' objections to enforcement.

I. THE STIPULATION DID NOT INTRUDE ON THE CORE FUNCTIONS OF THE COURT
¶ 20 As the court of appeals correctly noted, the law favors the settlement of disputes. See In re E.H., 2004 UT App 419, ¶ 12, 103 P.3d 177 (citing Mascaro v. Davis, 741 P.2d 938, 942 (Utah 1987)). It is indeed chilling to imagine the conditions that would exist within the judicial branch of government and society as a whole were settlements to be treated with hostility. The variety of agreements that disputing parties may reach is so vast as to defy cataloging them. Some agreements, like an agreement to arbitrate a dispute, substantially rein in a court's authority to intervene in the fact-finding enterprise.[2] Other agreements, such as an agreement to present a court with stipulated facts, may not affect a court's authority to disregard the stipulation and compel the parties to present evidence for the court to weigh and evaluate.
¶ 21 We are at a loss, however, to imagine why a court would insist on a process that preserves adversarial purity for its own sake. On the other hand, there are certain agreements that so compromise the core responsibilities of the court that they cannot be honored. We identified such an agreement in Salt Lake City v. Ohms, 881 P.2d 844, 848 (Utah 1994), when we rejected as unconstitutional a statute that authorized a prosecutor and a defendant to agree to permit a court commissioner to conduct a *815 criminal trial, impose sentence, and enter a final judgment. We agree with the court of appeals' conclusion that the stipulation between the mother and the adoptive parents did not unconstitutionally strip the district court of core functions because the district court did not surrender to Dr. Wehl its authority to enter a custody order. Rather, the court merely agreed to follow a process for the determination of the best interests of E.H. and to uphold this process so long as it adequately served that end.
¶ 22 Just as parties are generally free to agree upon facts subject to judicial application of the law, parties are likewise at liberty to exercise their freedom of contract in order to enlist others to aid in culling the "true" facts from the murky stew of conflicting versions of events held by the parties. There is little to distinguish between a stipulation that sets out facts agreed on through the parties' own labors and a stipulation that delegates to a third party the authority to determine the contours of the factual landscape. Both approaches lead to the same result: an uncontested factual record. Both types of stipulations may be perceived as paring back the role of the court as factfinder, but in most cases this result should be welcomed as an exercise entirely consistent with efficient and just judicial administration.
¶ 23 By adopting rule 53 of the Utah Rules of Civil Procedure governing masters, this court has provided legitimacy and a formal structure to the delegation of litigated issues. Under this rule, parties may refer both factual and legal issues to a master. In nonjury trials, like this one, "the court shall accept the master's findings of fact unless clearly erroneous." Utah R. Civ. P. 53(e)(2). Similarly, "when the parties stipulate that a master's findings of fact shall be final, only questions of law arising upon the [master's] report shall thereafter be considered." Utah R. Civ. P. 53(e)(4).
¶ 24 Nowhere, however, does rule 53 permit a master's authority to penetrate core judicial functions. We are mindful that the adoptive parents suggest otherwise. Although they provide no analysis in aid of their conclusion, the adoptive parents contend that rule 53 "appear[s] to be unconstitutional." Without comprehensive briefing on the question, we decline to decide today the constitutionality of rule 53, but we do note that the circumstances that give rise to the "finality" of a master's factual findings have much in common with the form in which stipulated facts typically appear, a form that presumptively binds the parties and establishes "finality."
¶ 25 It is telling that rule 53 does not have a counterpart in the rules of criminal procedure. Although the Ohms holding did not turn on the fact that the commissioner was presiding over a criminal matter, the nature of the litigation has direct relevance to dimensions of the core judicial functions in a particular setting. 881 P.2d at 848. As a general proposition, those cases that are most amenable to a free-wheeling display of the adversarial system are likewise cases that will accommodate the most expansive acts of judicial delegation without trespassing into core judicial functions. Most torts and commercial litigation would fall within this category.
¶ 26 By contrast, where considerations of public policy or fundamental constitutional rights permeate a case, more acute judicial oversight is warranted and often required. In these cases, a court must exercise greater care when delegating judicial functions. Adoption cases illustrate this point.
¶ 27 The legislature has assigned to the court the responsibility to enter a decree of adoption only "if satisfied that the interests of the child will be promoted by the adoption." Utah Code Ann. § 78-30-9 (2002). The legislature reinforced its intention to require judges to provide oversight of an adoptee's best interests by mandating an evidentiary hearing to determine the appropriate custodial placement whenever a petition for adoption is not granted. See Utah Code Ann. § 78-30-4.16 (2000).
¶ 28 The expectation that a court retain the final authority to decide custodial placements consistent with a child's best interest does not, however, render unenforceable the stipulation at issue here. Rather, the statutory mandate for judicial oversight of adoptions bolsters the correctness of the court of *816 appeals' conclusion that under the terms of the stipulation the district court held the ultimate authority to preside over the proceedings, to satisfy itself that Dr. Wehl's recommendations were properly arrived at, and to enter a final order. We therefore affirm the court of appeals' holding that the terms of the stipulation did not result in an impermissible intrusion into the core responsibilities of the court.

II. THE COURT OF APPEALS MISAPPREHENDED THE APPLICATION OF THE LAW OF THE CASE DOCTRINE TO THE DISTRICT COURT'S REJECTION OF THE STIPULATION
¶ 29 The second judge justified his reversal of the original judge's order that implemented the stipulation on both legal and factual grounds. He read Utah's adoption statute to require that he decide the lawfulness of the mother's relinquishment of her parental rights before he could take up consideration of her son's best interests. This legal interpretation and the related legal ruling prohibiting the mother from participating in the adoption proceedings vitiated the first judge's order that would have permitted the mother to participate in all proceedings related to determining the best interests of E.H.
¶ 30 The second judge formally voided the stipulation on factual grounds. After the adoption hearinga hearing from which the mother was barredthe second judge found that Dr. Wehl's report and recommendation was so flawed that it did not reliably speak to the issue of E.H.'s best interests.
¶ 31 Because the effect of these legal and factual rulings was to reverse a ruling of the first judge, the court of appeals reviewed them within the context of the law of the case doctrine. By analyzing the propriety of the second judge's rulings, primarily as a question of whether he properly exercised his discretion to overrule the order of the prior judge, the court of appeals applied an abuse of discretion standard. We believe that this was a mistake.
¶ 32 A challenge to a judge's reversal of a ruling made by a predecessor judge is inevitably composed of two issues. The first concerns whether the reversal so offends the prudential practice of refusing to reopen matters that have already been decided that it cannot be sustained. Messenger v. Anderson, 225 U.S. 436, 444, 32 S.Ct. 739, 56 L.Ed. 1152 (1912). This question is central to evaluating the application of the law of the case doctrine and, as the court of appeals correctly noted, is ordinarily reviewed under an abuse of discretion standard. The second component of an inquiry into a reversal of a prior order focuses on the nature of the matter decided. For example, if both the original ruling and the one that displaced it were based on applications of law each would be reviewed under a correctness standard. When a legal question is presented to an appellate court in law-of-the-case packaging, a potential dilemma can arise over which standard of review to apply.
¶ 33 We can identify no reason why an erroneous legal determination should be afforded greater discretion on appeal merely because it wears the garb of law of the case. For purposes of review, then, considerations of law of the case must yield to those of the substance of the underlying ruling when ascertaining the proper standard of review. By stating this rule, we do not intend to diminish the importance of the law of the case doctrine, nor do we surrender the authority of appellate courts to enforce the principle by vacating unexplained and unjustified renunciations of prior court orders.
¶ 34 Under the approach we endorse today, the second judge's legal ruling that a determination of the status of the mother's relinquishment was required prior to and as a condition for the mother's claim to standing in the adoption proceedings is subject to review for correctness, irrespective of the fact that the ruling implicated the law of the case doctrine. We reverse this ruling as an incorrect application of law for reasons we will shortly explain.
¶ 35 The standard of review applied by the court of appeals in reversing the second judge's decision to void the stipulation is unclear. On one hand, the court indicated that the proper standard of review for challenges brought under the law of the case *817 doctrine is abuse of discretion, it later admonished judges to honor the doctrine "unless a compelling reason exists," In re E.H., 2004 UT App 419, ¶ 23, 103 P.3d 177, and concluded that the second judge voided the stipulation without a compelling reason to do so. The court of appeals did not explain how it reconciled the relaxed scrutiny of the abuse of discretion standard with the rigor of the "compelling reason" test.
¶ 36 We conclude, however, that we need not review the decision to void the stipulation. Whatever misgivings or uncertainty we may harbor about the standard of review applied by the court of appeals when it reinstated the stipulation are not relevant to our analysis. The second judge voided the stipulation as part of a ruling in the adoption proceedings, an event from which the mother was erroneously barred due to an incorrect interpretation of law. The court's improper rejection of the mother's right to be heard on the question of best interests meant that only the voice of the adoptive parents was heard on the central issues of whether Dr. Wehl's credentials were sufficient to his assigned task, his methodology appropriate, and his recommendations sound. The absence of the mother from this process rendered it fatally flawed.
¶ 37 Given our conclusion that the district court retained final authority over the determination of E.H.'s best interests and was, therefore, entitled to exercise considerable latitude in ascertaining the weight and effect of Dr. Wehl's recommendations on the boy's best interests, we believe that the court of appeals reached too far when it reinstated the stipulation and the order of the first judge that gave it legal effect. Of course, this outcome repaired the flaw in the process by avoiding the need for an adoption hearing that the mother might attend. It may well be that the court of appeals selected this approach because it offered the promise of an accelerated route to the final placement of E.H. If that was the court's objective, it was a laudable one. It is not, however, a result that we can endorse.
¶ 38 We elect, instead, to fix the procedural defects by remanding this matter to the court of appeals with instructions to order that a new adoption hearing be conducted in which the mother is granted status as an intervenor for the purpose of presenting evidence concerning the best interests of her son. In this position, the mother should be permitted to present evidence in defense of Dr. Wehl and his evaluative report.
¶ 39 Our determination that the proper approach here is to correct the process and not the result is animated in no small measure by our recognition that no custodial decision can claim to actually reflect the best interests of E.H. that does not take into account the events of his life during the years in which the contest for his future has traversed our appellate courts.

III. THE STIPULATION GRANTED THE MOTHER AN ENFORCEABLE RIGHT TO PARTICIPATE IN THE COURT'S INQUIRY INTO WHETHER THE ADOPTION WAS IN E.H.'S BEST INTERESTS
¶ 40 The adoptive parents contend that among the stipulation's flaws was its failure to direct either the court or Dr. Wehl to determine the validity of the mother's relinquishment before considering the best interests of E.H. According to the adoptive parents, to do otherwise would unlawfully alter clear statutory adoption procedures that require a court to first determine that status of any party contesting the adoption before pursuing one of two alternative courses of action: to enjoin the adoption or to dismiss the adoption petition and conduct a hearing to determine the custodial arrangement most consistent with the child's best interests.
¶ 41 The adoptive parents successfully argued to the district court that regardless of any agreement with E.H.'s mother to the contrary, the court must first resolve the mother's claim that her relinquishment was legally infirm and, if it concluded that it was not, bar the mother from further participation in the adoption proceedings for lack of standing.
¶ 42 The district court justified its decision to void that portion of the stipulation that granted the mother standing to participate in the best interests proceedings of E.H. by *818 concluding that its ruling was mandated by statute. We therefore review the propriety of this ruling as a question of law, ceding no deference to the district court.[3] Our review leads us to conclude that the second judge erred when he overrode the parties' agreement to bypass the question of the legitimacy of the mother's relinquishment and proceed directly to a hearing on best interests, one in which the mother would not be permitted to participate.
¶ 43 We reach this conclusion based on the text of the adoption statute and our jurisprudence relating to standing and intervention. We first take up the statutory support for our holding.
¶ 44 The version of section 78-30-4.16 of the Utah Code in effect at the time of the district court's ruling addresses contested adoptions. Utah Code section 78-30-4.16 stated:
(1) Whenever any party contests an adoption, the court shall first determine whether the provisions of this chapter have been complied with. If a party who was entitled to notice and consent under the provisions of this chapter, was denied that right, and did not otherwise waive or forfeit that right under the terms of this chapter, the court may:
(a) enjoin the adoption, or dismiss the adoption petition, and proceed in accordance with Subsection (2); or
(b) determine whether proper grounds for termination of that parent's rights exist and, if so, order that the parent's rights be terminated in accordance with the provisions of this chapter or Title 78, Chapter 3a, Part 4, Termination of Parental Rights Act.
(2) (a) In any case, and under any circumstance, if a court determines that a petition for adoption may not be granted, the court may not automatically grant custody of a child to a challenging biological parent, but shall conduct an evidentiary hearing in each case, in order to determine who should have custody of the child, in accordance with the child's best interest.
(b) Evidence considered at that hearing may include, but is not limited to, evidence of psychological or emotional bonds that the child had formed with third parties and any detriment that a change in custody may cause to the child. The fact that a person relinquished a child to a licensed child placing agency or executed a consent for adoption may not be considered by the court as evidence of neglect or abandonment.
(c) Any custody order entered pursuant to this section may also include provisions for visitation by a biological parent or interested third party, and provide for the financial support of the child.
(3) An adoption may not be contested after the final decree of adoption is entered.
Utah Code Ann. § 78-30-4.16 (2000).
¶ 45 Apparently, this is the provision that the second judge relied on when he rejected the stipulation's grant of standing to the mother. It is also the centerpiece of the argument the adoptive parents make to us seeking reversal of the court of appeals. It becomes evident on close inspection of this *819 section, however, that it does not deprive the mother of standing to present evidence on E.H.'s best interests within the context of an adoption proceeding.
¶ 46 The first sentence of Utah Code section 78-30-4.16(1) directs a court presiding over a contested adoption to make a threshold inquiry into statutory compliance. This expansive admonition is refined by the second sentence which, when read literally, limits the court's inquiry into statutory compliance to "a party who was entitled to notice and consent." Utah Code Ann. § 78-30-4.16(1) (2000). If the court determines that a member of the class of persons entitled to both notice and consent was denied notice, did not give lawful consent, and did not excuse the need for consent through valid relinquishment, waiver, or forfeiture of parental rights, it may either proceed with a determination of whether a contesting parent's parental rights should be terminated or conduct a custody hearing for the adoptee based on "best interests" considerations. See Utah Code Ann. § 78-30-4.16(1), (2).
¶ 47 Under the formulation of section 78-30-4.16 of the Utah Code, a "best interests" hearing to determine the best custody arrangement for the child would occur after "a court determines that a petition for adoption may not be granted." Id. Thus, the "contest" to the adoption contemplated by this section has nothing to do with the issue of whether the proposed adoption is in the best interests of the adoptee and everything to do with whether all actual or potential parental rights that might cause an impediment to the adoption have been extinguished. If they have not, the "best interests" evidentiary hearing mandated by section 78-30-4.16 is not an adoption contest at all because an adoption is no longer pending. The mandated event is, instead, a custody hearing.
¶ 48 Although the district court's determination that the mother's relinquishment was lawful freed it of a duty to conduct this custody hearing under section 78-30-4.16, that ruling did not relieve the court of its statutory responsibility to conduct a meaningful inquiry into whether the proposed adoption of E.H. was consistent with his best interests. That duty is assigned to the court under the provisions of section 78-30-9, which directs the court to "examine each person appearing before it in accordance with this chapter, separately, and, if satisfied that the interests of the child will be promoted by the adoption, it shall enter a final decree of adoption." Utah Code Ann. § 78-30-9 (2002).
¶ 49 Section 78-30-9 does not describe who may appear before the court for examination concerning the effect of the adoption on the adoptee's best interests. In order to determine who may appear before the court, we must look to the law of standing and, its procedural cousin, intervention. The doctrine of standing ensures that the court will have the benefit of truly adverse parties in resolving a case. A plaintiff who has not been granted standing to sue by statute must either show that he has or would suffer a "distinct and palpable injury that gives rise to a personal stake in the outcome" of the case or meet one of the two exceptions to standing recognized in cases involving "important public issues." Wash. County Water Conservancy Dist. v. Morgan, 2003 UT 58, ¶ 17, 82 P.3d 1125. In courts of general jurisdiction, standing is not a rigid or dogmatic rule, but one that must be applied with some view to realities as well as practicalities. See Washakie County School Dist. No. One v. Herschler, 606 P.2d 310, 317 (Wyo.1980).
¶ 50 In general, standing is available only to a person who has sustained some injury to her legal, personal, or property rights. Jenkins v. Swan, 675 P.2d 1145, 1148 (Utah 1983). The district court believed that its determination that the mother's relinquishment was lawful conclusively denied her standing in the subsequent adoption hearing. The district court reasoned that because the relinquishment left the mother with no right or interest that could be affected by the proceeding, she lacked standing to participate in those proceedings. We need not rule today whether all of the mother's interests in E.H. were extinguished; however, because even if we were to accept this line of reasoning as true, the presence or absence of parental rights does not determine whether a *820 person has standing to intervene in an adoption proceeding.
¶ 51 Intervention is the act by which a third party obtains standing to become a party in a suit. It has been described as a method by which an outsider with an interest in an action may enter and participate as a party. To justify intervention, the party seeking intervention must demonstrate a direct interest in the subject matter of the litigation such that the intervenor's rights may be affected, for good or for ill. See Lima v. Chambers, 657 P.2d 279, 282 (Utah 1982). The requisite interest necessary to permit intervention may arise from the intervenor's status or her circumstances. Rule 24(a)(2) of the Utah Rules of Civil Procedure, which governs intervention as of right, describes the connection that must exist between a person's status or circumstances and the lawsuit in order to justify intervention, stating:
When the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by the existing parties.
Utah R. Civ. P. 24(a)(2) (2006).
¶ 52 Here, the parties stipulated that the mother had the necessary interest in her son to participate in the determination of his best interests irrespective of her parental status. Although we have not adopted the view that a court must always honor a claim of standing conferred by stipulation neither, do we categorically reject the notion that standing, unlike jurisdiction, can arise from an agreement.[4] As in many states, we find that in Utah standing acquired by stipulation is enforceable.[5] Moreover, we have recognized "de facto" intervention where parties have failed to object to a nonparty's participation in an action. See Ostler v. Buhler, 1999 UT 99, ¶ 7, 989 P.2d 1073. Here, the adoptive parents' consent to the mother's standing and intervention was not dependent on inference but was expressly granted by the stipulation.
¶ 53 Standing and the right to intervene may also be conferred by statute. Utah Code section 78-30-4.13(11) grants the right to intervene on persons who are entitled to notice of an adoption proceeding stating, "Except as to those persons whose consent to an adoption is required under Section 78-30-4.14, the sole purpose of notice under this section is to enable the person served to intervene in the adoption and present evidence to the court relevant to the best interest of the child." Utah Code Ann. § 78-30-4.13(11) (2002) (emphasis added).
¶ 54 Clearly, the hearing at which the relevant best interests evidence is to be presented cannot be the custody hearing mandated in Utah Code section 78-30-4.16. That hearing is not an adoption hearing because it can only occur if the court determines that the petition for adoption cannot be granted. See Utah Code Ann. § 78-30-4.16(2)(a). It must be that the forum for the presentation of section 78-30-4.13(11) "best interest" evidence is the section 78-30-9 "best interest of the child" (a.k.a. "adoption") examination.
¶ 55 The members of the class of persons authorized by Utah Code section 78-30-4.13(11) to intervene and present evidence includes persons whose consent to the adoption or relinquishment of parental rights is not required, including a legally appointed custodian or guardian of an adoptee, Utah Code Ann. § 78-30-4.13(2)(c), and an adoptee's spouse, Utah Code Ann. § 78-30-4.13(2)(e). A mother, like E.H.'s mother, who has relinquished her parental rights does not have a right to receive notice and is *821 excluded from the class of persons upon which the statute confers a right to intervene and present best interests evidence. However, by merely extending to a particular class of persons an express invitation to intervene in an adoption and present best interests evidence, Utah Code section 78-30-4.13(11) does not foreclose the possibility that other persons may, by reason of status or circumstance, also be eligible to intervene and present relevant best interests evidence. We do not read section 78-30-4.13(11) as restricting those who may be eligible to intervene in the adoption and present relevant best interests evidence to persons entitled to notice. Rather, section 78-30-4.13(11) authorizes intervention to persons who may "present evidence to the court relevant to the best interest of the child." Utah Code Ann. § 78-30-4.13(11).
¶ 56 By expressly granting a right of intervention to other persons who have no parental interest in an adoptee, Utah Code section 78-30-4.13(11) manifests the unmistakable intention to ground standing to intervene on whether the prospective intervenor can demonstrate an interest in or relevant evidence about the adoptee's best interests irrespective of parental status.
¶ 57 Even without the stipulation, the mother has made the requisite showing for intervention under rule 24(a). She actively participated in the selection of the adoptive parents. She lived in the adoptive parents' home and observed the environment and family dynamics. She even pursued, without objection to her standing, an action seeking custody of her son. Finally, she consented to a stipulation directed exclusively to advancing the best interests of E.H. We therefore hold that the stipulation is enforceable insofar as it confers standing and a right to intervene on the mother to present relevant evidence of E.H.'s best interests at an adoption hearing.
¶ 58 We reiterate that the hearing in which the mother is entitled to participate is, in the first instance, the section 78-30-9 adoption hearing. Only in the event that the court determines that the petition for adoption should not be granted must it then hold the custody hearing described in Utah Code section 78-30-4.16(2).
¶ 59 The adoptive parents cling to K.S. v. S.H. (In re B.B.), 2002 UT App 82, 45 P.3d 527, aff'd sub nom. Hardinger v. Scott (State ex rel. B.B.), 2004 UT 39, 94 P.3d 252, to buoy up their contention that a court may not enforce a stipulation that purports to confer standing. In particular, they insist that B.B. stands for the proposition that a stipulation that is incompatible with the adoption statute is unenforceable. Both the B.B. opinion issued by the court of appeals and our opinion affirming the outcome turned on a determination that the juvenile court lacked continuing jurisdiction over a decree of adoption that it had entered. Therefore, it could not modify the decree to reflect visitation rights of grandparents that had been omitted but had been agreed to in a stipulation between the grandparents and the adoptive parents. This case presents no such jurisdictional question.
¶ 60 For her part, E.H.'s mother has staked her claim to standing on the language of Utah Code section 78-30-4.24, which at the time she filed her petition for custody stated, "Any interested party may petition the court for a determination of the rights and interests of any person who may claim an interest in a child under this chapter, at any time prior to the filing of a petition for adoption, including any time prior to the child's birth." Utah Code Ann. § 78-30-4.24 (2002). When read as a stand-alone expression of standing to sue, this statute is very expansive, granting standing to "any interested party." The adoptive parents contend, plausibly, that despite its broad language, E.H.'s mother cannot be an interested person because she has relinquished her parental rights and is therefore no more "interested" in E.H. than a stranger. The mother counters by pointing to Utah Code section 78-30-11 (2002). This provision fixes the entry of the decree of adoption as the date upon which birth parents cease "all parental duties toward and all responsibilities for the adopted child." Id. This language carries the inescapable inference that birth parents, like E.H.'s mother, retain some residual "interest" *822 in her child, even where parental rights have been lawfully relinquished.
¶ 61 When we survey the adoption statute as a whole, however, it becomes apparent that Utah Code section 78-30-4.24 was not intended to provide a statutory basis upon which to contest adoptions. The best case for this assertion draws on the language of the section itself. As formulated at the time the mother filed her custody petition, section 78-30-4.24 authorized an interested person to seek a determination of the status of another putative claimant to an interest in a child "at any time prior to the filing of a petition for adoption." Utah Code Ann. § 78-30-4.24 (2002).[6] This timing restriction erects a considerable conceptual barrier to the notion that section 78-30-4.24 was intended to grant standing to those wishing to challenge an adoption, because the opportunity to challenge the interests of others expired with the filing of an adoption petition.
¶ 62 That Utah Code section 78-30-4.24 was not intended to serve as an adoption contest mechanism is reinforced by the policy expressed with the adoption statute to preserve the anonymity of prospective adoptive parents. Section 78-30-4.13(10) codifies this policy by stating that "[n]otwithstanding any other provision of law, neither the notice of an adoption proceeding nor any process in that proceeding is required to contain the name of the person or persons seeking to adopt the adoptee." Utah Code Ann. § 78-20-4.13(10) (2002).
¶ 63 If Utah Code section 78-30-4.24 was not intended to serve an alternate statutory means to contest an adoption, what is its purpose? The section must be intended to protect child placement agencies and prospective adoptive parents from the risk of an adoption contest by obtaining an adjudicated extinguishment of the claims of persons who might stand in the way of the adoption. This assessment best serves the policy interests announced by the legislature in "providing stable and permanent homes for adoptive children in a prompt manner [and] in preventing disruption of adoptive placements." Utah Code Ann. § 78-30-4.12(2)(a). To this end, section 78-30-4.24 exists to facilitate adoptions, not to contest them. We therefore conclude that section 78-30-4.24 of the Utah Code did not provide E.H.'s mother grounds to challenge E.H.'s adoption. We hold, however, that her stipulation with the adoptive parents did.

IV. THE DISTRICT COURT'S RULING THAT THE MOTHER'S RELINQUISHMENT WAS LAWFUL WAS NOT CLEARLY ERRONEOUS
¶ 64 The mother claims that the district court's ruling that her relinquishment was lawful and binding was not supported by sufficient evidence. We will affirm the district court's determination of this issue unless it is clearly erroneous. We have assigned to parties who mount challenges to outcomes based on insufficient factual support the duty to marshal evidence. "In order to challenge a court's factual findings, an appellant must first marshal all the evidence in support of the finding and then demonstrate that the evidence is legally insufficient to support the finding even when viewing it in a light most favorable to the court below." Chen v. Stewart, 2005 UT 68, ¶ 53, 123 P.3d 416. This assignment is not intended to gratuitously oppress an appellant; rather it exists to facilitate a structured, realistic, and skeptical appraisal of facts without unduly compromising the adversarial process. At its core, the duty to marshal evidence contemplates that an appellant present "every scrap of competent evidence introduced at trial which supports the very findings the appellant resists" and then "ferret out a fatal flaw in the evidence," becoming a "devil's advocate." State v. Green, 2005 UT 9, ¶ 28, 108 P.3d 710 (citing Justice Michael J. Wilkins et al., Utah Appellate Practice, 2000 Utah L.Rev. 111, 127).
*823 ¶ 65 Here, the mother has wholly failed to marshal the evidence, electing instead to invite us to relitigate the lawfulness of her relinquishment in its entirety. This we decline to do.

CONCLUSION
¶ 66 To describe as "unfortunate" the perverse and protracted course of events that has followed the parties' otherwise praiseworthy decision to agree upon a procedure designed to bring about a timely and less disputatious resolution of their dispute over the custodial fate of E.H. greatly understates our concern for the harmful effects that years of litigation have visited on this young man. Our legislature has voiced a clear and consistent belief that the "best interest of a child" is defined to a substantial degree by the presence of a prompt, permanent, and secure parental attachment. As we said in Hardinger, "The legislature has expressly provided that `the state has a compelling interest in providing stable and permanent homes for adoptive children ... [and] in preventing the disruption of adoptive placements,' and `adoptive children have a right to permanence and stability in adoptive placements.'" 2004 UT 39, ¶ 15, 94 P.3d 252 (quoting Utah Code Ann. § 78-30-4.12(2)(a)-(c)).
¶ 67 We regret that we cannot provide E.H. a permanent and secure parental attachment with our holding today. We remand this matter to the court of appeals with instructions to proceed in accordance with this opinion. The centerpiece of our instructions is the mandate that the district court permit the mother to intervene in an adoption hearing to be conducted pursuant to Utah Code section 78-30-9 with dispatch. We express no view concerning what the outcome of that hearing should be.
¶ 68 In the event that the district court determines that the adoption is in the best interests of E.H., the matter will be concluded, subject to appeal. We feel it prudent, however, to describe the procedure to be followed in the event that the district court determines that the adoption is not in E.H.'s best interests.
¶ 69 When an adoption petition is dismissed following a proceeding conducted under section 78-30-9, the court must proceed under section 78-30-4.16(2)(a). During the relevant period, this provision stated:
In any case, and under any circumstance, if a court determines that a petition for adoption may not be granted, the court may not automatically grant custody of a child to a challenging biological parent, but shall conduct an evidentiary hearing in each case, in order to determine who should have custody of the child, in accordance with the child's best interest.
Utah Code Ann. § 78-30-4.16(2)(a) (2000).
¶ 70 This section is sweeping in its scope and applies by its own terms in every instance when an adoption petition is dismissed. The unique facts in this case complicate its application here because the mother would participate in the hearing as the biological mother of E.H. but under the disability brought about by her relinquishment of her parental rights.
¶ 71 Should the district court determine that placement with the mother is in his best interests, that ruling, arising in the context of a section 78-30-4.16 hearing, would not reestablish the parent-child relationship between the mother and E.H. That could only be accomplished through an adoption proceeding commenced by the mother.
¶ 72 With the facts of this case in mind, and noting the congruence of the statutory framework and the legislative intent to provide permanent placements for adoptive children, we expect the district court to conduct a "best interest of the child" (a.k.a. "adoption") examination as rapidly as possible. At this hearing, the court will determine whether it is in the best interests of E.H. to award adoption and custody to the adoptive parents. We express no view as to the proper outcome. As discussed above, Utah Code section 78-30-4.13(11) authorizes intervention in this proceeding to persons who "may present evidence to the court relevant to the best interests of the child[;]" and the mother in this case meets that test. Furthermore, her right to testify and present evidence at the section 78-30-9 hearing is confirmed by Utah *824 Rule of Civil Procedure 24(a) and the stipulation.
¶ 73 Should the district court find it not to be in E.H.'s best interests to grant the adoptive parents' petition, then E.H. should temporarily remain a ward of the adoption agency. The district court must then promptly hold a Utah Code section 78-30-4.16 custody hearing.
¶ 74 If this stage is reached, it is at this hearing that the district court will determine who among all of the interested parties should be granted custody and whether any party is entitled to visitation or other accommodations. We intend that, in this case, should the mother be granted custody at the section 78-30-4.16 hearing that her prior relinquishment be nullified and her full status as natural parent be restored.
¶ 75 We urge the court of appeals, the district court, and the parties to achieve finality under the guidelines of this opinion as expeditiously as possible.
¶ 76 We remand this matter to the court of appeals with instructions to proceed in accordance with this opinion.
¶ 77 Chief Justice DURHAM, Associate Chief Justice WILKINS, Justice DURRANT, and Justice PARRISH concur in Justice NEHRING'S opinion.
NOTES
[1] The court of appeals voiced understandable skepticism over the fact that the adoptive parents discovered allegedly fatal defects in the stipulation only after Dr. Wehl recommended that E.H. be placed with his mother rather than with them. We agree that the circumstances under which the adoptive parents mounted their assault on the stipulation carry all the telltale signs of an effort by a disappointed party to repudiate a bargain fairly struck. We have exercised care, however, to avoid permitting our misgivings about the adoptive parents' motives to color our analysis of the legal issues presented.
[2] See generally Utah Arbitration Act, Utah Code Ann. §§ 78-31a-101 to -131 (2002) (requiring courts to enforce arbitration agreements in most situations and restricting a court's power to alter arbitration awards).
[3] Owing to the structure of the adoption statute, the reach of our discussion of standing will necessarily extend to the related issue of intervention. This court last decided the fate of a stipulated intervention in In re Marriage of Gonzalez, 2000 UT 28, ¶¶ 32-41, 1 P.3d 1074. A majority of the court affirmed the trial court's decision to enforce the stipulated intervention. There was no consensus on a rationale. Three justices agreed that a court may disregard a stipulation to intervene when the intervention would offend public policy. The three split, however, over whether the stipulation before the court ran afoul of public policy. The outcome was no more settled on the question of the appropriate standard of review to apply. Two justices advocated de novo review. Two championed a deferential abuse of discretion standard. One took no position.

Our quest for the proper standard of review here is less challenging. The district court interpreted Utah Code section 78-30-4.16 to mean, as a matter of law, that upon finding the mother's relinquishment was effective that it must foreclose her from further participation in the adoption proceedings. Under these circumstances, we review the enforceability of the stipulation's effect on the mother's standing and right to intervene in the adoption for correctness.
[4] While the court of appeals has not specifically rejected this notion, we realize that it has expressed doubt about its validity when it stated that "it is doubtful whether a party may stipulate as to standing; questions of law are generally not subject to stipulation." Sierra Club v. Dep't of Envtl. Quality, 857 P.2d 982, 985 (Utah Ct.App. 1993).
[5] See, e.g., Everroad v. State, 590 N.E.2d 567, 569 (Ind.1992); Graham v. Worthington, 259 Iowa 845, 146 N.W.2d 626, 631 (1966); Melzer v. Fla. Dep't of Cmty. Affairs, 881 So.2d 623, 625 (Fla. Dist.Ct.App.2004); Aebig v. Commercial Bank of Seattle, 36 Wash.App. 477, 674 P.2d 696, 697 (1984).
[6] Today Utah Code section 78-30-4.24 extends this right from "any time prior to the filing of a petition for adoption[,]" Utah Code Ann. § 78-30-4.24 (2002) (emphasis added), to "any time prior to the finalization of the adoption." Utah Code Ann. § 78-30-4.24 (Supp.2005) (emphasis added). We believe that the legislature extended the period of this section in order to provide better opportunities for potential adoptive parents to extinguish the interests of anyone who might contest the adoption.