2006 UT 64

## In the matter of the ADOPTION OF P.N., a minor.

A.N., Appellant,

v.

M.I.W. and T.Y.W., Appellees.

R.S., Appellant,

v.

M.I.W. and T.Y.W., Appellees.

Nos. 20050986, 20051015.

Supreme Court of Utah.

Oct. 27, 2006.

Rehearing Denied Dec. 6, 2006.

David Dolowitz, Joshua K. Peterman, Salt Lake City, for appellant A.N.

Russell Y. Minas, Salt Lake City, for appellant R.S. Les F. England, Park City, for appellee.

DURHAM, Chief Justice:

### INTRODUCTION

¶ 1 This case began as a petition for adoption of the minor child P.N. which was challenged by both the biological father and the biological mother. The district court dismissed the adoption petition, but granted custody to the couple seeking adoption and denied any visitation to the biological parents. The parents appeal this ruling. We reverse and remand to the district court.

### BACKGROUND[1]

¶ 2 In September 2003, Arturo Nuosci of Las Vegas, Nevada, and Rachel Sullivan of Salt Lake City, Utah, entered into a contract wherein Ms. Sullivan agreed to be impregnated by Mr. Nuosci's sperm, carry the child to term, and thereafter relinquish all of her parental rights to the child. Ms. Sullivan gave birth to Mr. Nuosci's child in exchange for approximately $23,000. As a result of this arrangement, on July 13, 2004, P.N. was born at a Salt Lake City hospital. The following day, Ms. Sullivan gave the child to Mr. Nuosci and signed a relinquishment of her parental rights. Mr. Nuosci then traveled to Las Vegas and cared for the child

---

1. The basic facts of this case, which are undisputed on appeal by the parties, are derived from the two rulings issued by the district court.

until September 17, 2004, when he was arrested on federal charges for making a false statement on a passport application. P.N. was placed in the custody of Nevada child protective services. Despite Mr. Nuosci's arrangements for his sister, Dolores Rizzi, to care for the child while he was in federal custody, child protective services contacted Ms. Sullivan to pick up the child. On September 20, 2004, Ms. Sullivan picked up P.N. and returned with him to Salt Lake City.

¶ 3 Upon returning to Utah, Ms. Sullivan communicated with an acquaintance, who put her in contact with the Worthingtons, a couple interested in adopting a child. The Worthingtons took custody of P.N. on October 16, 2004, and P.N. has been with them since that time. Ms. Sullivan and the Worthingtons orally agreed to an "open adoption" where Ms. Sullivan would continue to have contact with P.N. On November 9, 2004, the Worthingtons filed a Petition for Adoption. On November 24, 2004, Ms. Sullivan signed a second relinquishment of her parental rights in the presence of Suzanne Stott, a representative of a licensed child placement agency, Families for Children.[2] Ms. Sullivan later experienced doubts about relinquishing her parental rights to P.N. and changed her mind about the adoption. The Worthingtons responded by refusing to give Ms. Sullivan access to P.N. and deciding not to allow an open adoption despite the earlier oral agreement. Ms. Sullivan filed a written challenge to the Worthingtons' petition for adoption in early January 2005.

¶ 4 The biological father, Mr. Nuosci, remained in federal custody throughout the negotiations between Ms. Sullivan and the Worthingtons and is currently incarcerated. When he was advised of the existence of the adoption petition in mid-November 2004, he immediately objected and eventually acquired pro bono representation to contest his

son's adoption.[3] Thus, by early 2005, both of P.N.'s biological parents had intervened to contest the Worthingtons' petition for adoption.

¶ 5 The district court held evidentiary hearings to determine if the biological parents were proper intervenors in the adoption proceedings. It concluded that Ms. Sullivan had standing because both of the relinquishments of her parental rights were invalid. First, the agreement entered into by Mr. Nuosci and Ms. Sullivan was invalid under the laws of both Utah and Nevada, and thus unenforceable. Because the first relinquishment of parental rights by Ms. Sullivan was merely an extension of this contract, it was also void. Second, the relinquishment signed by Ms. Sullivan in the presence of Suzanne Stott, the representative of Families for Children, was also invalid. It did not meet the requirements of Utah Code section 78–30–4.18 (Supp.2006) as it was not performed before a judge, nor was the biological mother's signature notarized or witnessed by two independent individuals. Because both relinquishments were invalid, the court held that Ms. Sullivan retained her parental rights and was a proper party to intervene. This holding has not been challenged on appeal.

¶ 6 The district court also determined that Mr. Nuosci had standing to challenge the adoption of his son. He is the biological father of P.N., as evidenced by the child's birth certificate and the fact that he had sole physical custody, with the mother's consent, beginning the day after P.N.'s birth until Mr. Nuosci's arrest approximately two months later. This holding likewise has not been appealed.

¶ 7 Despite allowing each biological parent to intervene, the district court refused to grant visitation to Ms. Sullivan or to Mr. Nuosci's sister, giving full discretion to the

2. Despite the foresight of the parties in retaining the services of a licensed agency, Ms. Stott failed to follow the guidelines for relinquishments outlined in Utah Code Ann. section 78–30–4.18 (Supp.2006), which require that the biological mother's signature be notarized and two independent witnesses be present at the signing. We note that Ms. Stott was also responsible for the problematic home study in *In re E.H.*, 2006 UT 36, ¶¶ 4, 7, 137 P.3d 809.

3. The district court's opinion reports that the Utah Supreme Court was somehow involved in finding an attorney to assist Mr. Nuosci. The record is devoid of any information regarding the basis of this assertion, and we note that this court played no role in the process of securing counsel for Mr. Nuosci.

Worthingtons, as P.N.'s custodians, to allow or deny access to the child.[4]

¶ 8 Having found that the parents were proper parties to contest the adoption, the court scheduled a "best interests trial" pursuant to Utah Code section 78–30–4.16 to determine the custody of the child and "resolve all remaining issues between all the participants." As a result of this trial, the district court dismissed the petition for adoption. The court held that P.N. could not be adopted when his father had never consented to the adoption and his mother's relinquishments were invalid. Additionally, the district court concluded that there were no grounds for termination of either of the biological parents' parental rights-no unfitness, abandonment, abuse, or neglect existed. Because both biological parents retained their parental rights, adoption was improper.

¶ 9 Following the statutory framework of Utah Code section 78–30–4.16(2)(b), the district court then determined custody of P.N. through a "best interests" analysis. Notwithstanding his its conclusion that both parents were fit, the district court held that the parental presumption generally afforded to a child's natural parents had been rebutted as to both Mr. Nuosci and Ms. Sullivan. This placed Mr. Nuosci, Ms. Sullivan, and the Worthingtons on equal footing. Then, applying the best interests analysis to all parties, the district court concluded that the Worthingtons were the proper custodians for P.N. It also denied requests for visitation, giving complete discretion to the Worthingtons to allow or deny visitation by P.N.'s parents.

¶ 10 Ms. Sullivan and Mr. Nuosci filed separate appeals from the district court's ruling to the Utah Court of Appeals. No cross-appeals were filed by the Worthingtons on the dismissal of the adoption petition or on the court's findings regarding termination

of parental rights. The court of appeals certified both cases to this court, and we now consolidate them for disposition. We have jurisdiction pursuant to Utah Code section 78–2–2(3)(b) (2002).

## ANALYSIS

■ ¶ 11 P.N.'s parents raise numerous challenges to the conclusions of the district court. In addition, Mr. Nuosci challenges the constitutionality of Utah Code section 78–30–4.16 (Supp.2006). Because we reject the interpretation of the statute relied on by the district court, we need not address the individual challenges of the appellants. Instead, in outlining the correct construction of the statute, we resolve the claims of the parties.

■ ¶ 12 "[M]atters of statutory construction are questions of law that are reviewed for correctness." *Esquivel v. Labor Comm'n*, 2000 UT 66, ¶ 13, 7 P.3d 777 (internal quotation marks omitted). In this case, to the extent the district court's ruling purports to grant permanent custody of P.N. to the Worthingtons and permits them to withhold access to the child from his fit biological parents,[5] it is in error. We hold that the district court misconstrued the nature of the grant of custody contemplated under section 78–30–4.16(2)(b) in the event of a failed adoption.

¶ 13 Utah Code section 78–30–4.16 concerns contested adoptions. When parents have not consented to an adoption and a court determines there "are not proper grounds to terminate [their] parental rights, the court shall: (i) dismiss the adoption petition; (ii) conduct an evidentiary hearing to determine who should have custody of the child; and (iii) award custody of the child in accordance with the child's best interest." Utah Code Ann. § 78–30–4.16(2)(b). Thus, when there are inadequate grounds for an

---

4. The Worthingtons completely denied Ms. Sullivan access to P.N.; however, they permitted Dolores Rizzi, Mr. Nuosci's sister, to visit with the child in March and April of 2005.

5. We note that one issue presented in this case is the propriety of visitation and custody by the designated guardian of a biological parent. Mr. Nuosci, while he is incarcerated, seeks visitation and custody of P.N. for his sister on his behalf.

The question of her legal rights, separate and apart from Mr. Nuosci's, and Mr. Nuosci's right to designate custody of P.N. when the biological mother with parental rights intact is available, has not yet been raised and briefed. We leave this issue for the trial court to examine in the process of its determination of permanent custody for P.N.

adoption to take place because biological parents retain their parental rights to the child or for other reasons, the statute provides a process to deal with the issue of immediate custody due to the failed adoption; it does not deal with permanent custodial awards.

¶ 14 The context of section 78–30–4.16(2)(b)'s operation demonstrates that it is intended to apply in the case of a failed adoption, and is not meant to take the place of the general body of law regarding custody issues between fit parents. The statute is not designed to establish the permanent placement of a child, nor is it meant to resolve a custody battle which may ensue, as it likely will in this case, between two fit biological parents. The award of immediate custody by the court following a failed adoption is merely a temporary placement pending final disposition of custody. Use of this statute to award permanent custody through a best interest analysis, when such use would deprive fit parents of custody and visitation, would in all likelihood create constitutional problems, and we will not assume that the legislature intended such a result.

¶ 15 In the present case, the district court erred in using the statute to effect a de facto permanent deprivation of custody by fit biological parents. While the Worthingtons may have been proper temporary custodians until Mr. Nuosci and Ms. Sullivan could agree on a custody arrangement or until a court could resolve a custody dispute between them, the permanent award of custody of P.N. to legal strangers was impermissible. Section 78–30–4.16(2)(b) cannot be used to permanently cut off custody and visitation to parents who have not been found unfit and who have not consented to such placement. It cannot be used to give permanent custody of a child to legal strangers, which is what the Worthingtons became once the court dismissed their petition for adoption.

¶ 16 Furthermore, the district court erred in barring visitation by fit biological parents while the process for a final disposition of custody proceeds. When a court determines that a petition for adoption must be dismissed, it cannot prohibit association between the child and fit biological parents, nor can it give full discretion to the child's custodians to deny visitation absent some specific finding of harm to the child.

¶ 17 A failed adoption necessarily creates the immediate dilemma as to where the child shall go once court is adjourned. Where a biological parent is ill, in the military, or as in this case, incarcerated, a temporary placement may be required to deal with the immediate situation. This is also true where a custody battle between two biological parents looms once the adoption fails. Moreover, temporary custody may be necessary when a transitional period is needed so that the child can become reacquainted with his parent when little contact has occurred during the adoption proceedings. Within a short time period after a failed adoption and in line with the state's interest in providing permanent and stable homes for children, a new hearing must be held to award permanent custody; section 78–30–4.16(2)(b) merely deals with the immediate need for the care of the child.

## FUTURE PROCEEDINGS

¶ 18 Because of the complexity of this case and our conclusion that the district court erred in its decisions regarding custody and visitation of P.N., we outline the steps that the parties and the district court should now take. This case was originally brought as a petition for adoption; that petition has been dismissed, and the dismissal was not challenged on appeal. The district court's order of custody to the Worthingtons, as explained above, can only be a temporary order. Unless both parents agree, the Worthingtons may not retain custody of P.N. in the long term. Thus, Mr. Nuosci and, alternatively or additionally, Ms. Sullivan need to file petitions for permanent custody of P.N. The Worthingtons presumably should be named in such proceedings so that they will produce the child. The district court will then need to conduct a best interests hearing under traditional custody analysis in order to determine the appropriate custody arrangement for P.N. as between his two biological parents. The court may order custody evaluations and pursue this process as it would in any other custody case. Although it will be difficult given the history of this case, it is hoped that the biological parents will put

aside their individual interests and focus instead on the needs of their small child, who has presumably enjoyed considerable affection, care, and stability with the Worthingtons. The child's bonds with those caretakers must not be ignored or minimized, and we urge the parties to seek professional assistance in their decision-making processes and in planning for any transitions that become necessary in the child's life.

¶ 19 After filing their petitions for custody, we encourage Mr. Nuosci and Ms. Sullivan to pursue a custody agreement in a cooperative manner and to include the Worthingtons in this process. Consultation with a professional advisor who could offer independent and objective advice regarding the child's best interests would be highly desirable. Above all, flexibility and cooperation among the adults who profess an interest in P.N.'s welfare will be essential if the negative effects of his short but complicated history are to be minimized. The use of mediation as an alternative to court proceedings is strongly advised.

## CONCLUSION

¶ 20 The portions of the district court's order awarding permanent custody of P.N. to the Worthingtons and permitting them to deny contact or visitation by Ms. Sullivan and Mr. Nuosci are reversed. The Worthingtons will retain temporary custody pursuant to the district court's order until further proceedings regarding permanent custody can be initiated.

¶ 21 Associate Chief Justice WILKINS, Justice DURRANT, Justice PARRISH, and Justice NEHRING concur in Chief Justice DURHAM's opinion.