2022 UT 35

IN THE

# SUPREME COURT OF THE STATE OF UTAH

DAVID JENKINS TAYLOR,
*Appellant*,

*v.*

JILL MARIE TAYLOR,
*Appellee*.

No. 20191090
Heard: April 13, 2022
Filed August 18, 2022

On Certification from the Court of Appeals

Third District, Summit County
The Honorable Teresa Welch
No. 174500181

Attorneys:

Julie J. Nelson, Millcreek, Erin B. Hull, Salt Lake City, for appellant

Martin N. Olsen, Beau J. Olsen, Midvale, for appellee

ASSOCIATE CHIEF JUSTICE PEARCE authored the opinion of the Court, in which CHIEF JUSTICE DURRANT, JUSTICE PETERSEN, JUSTICE HAGEN, and JUDGE HARRIS joined.

Due to their retirement, JUSTICE HIMONAS and JUSTICE LEE did not participate herein; JUSTICE DIANA HAGEN and COURT OF APPEALS JUDGE RYAN M. HARRIS sat.[*]

ASSOCIATE CHIEF JUSTICE PEARCE, opinion of the Court:

## INTRODUCTION

¶1 After litigating their divorce for a year, David Taylor asked his soon-to-be ex-wife, Jill Taylor, to arbitrate. David apparently

---

[*] JUSTICE DIANA HAGEN became a member of the Court on May 18, 2022 but sat as a visiting judge prior to her confirmation.

hoped for an expeditious resolution that would allow him to receive favorable tax treatment of the alimony he was about to pay. After the arbitrator issued his decision, David moved the district court to invalidate the award under section 78B-11-107 of the Utah Uniform Arbitration Act, arguing that the arbitration agreement he proposed was invalid because it was contrary to public policy to arbitrate divorce actions. David alternatively asked the court to vacate the award, arguing that the arbitrator had manifestly disregarded the law. The district court denied David's motion.

¶2 The Utah Uniform Arbitration Act does not permit a party who participates in arbitration without objection to then contest an arbitration award by arguing that it is based on an infirm agreement to arbitrate. But even if David was able to contest the award, the arbitration agreement he sought was not invalid. Unless and until the Legislature provides additional guidance, the intersection of the Utah Uniform Arbitration Act and Utah family code permits parties to arbitrate the aspects of a divorce that the Taylors agreed to arbitrate. As for David's assertion that the arbitrator manifestly disregarded the law, even if we assume that is still a viable challenge to an arbitration award, David has not shown that the arbitrator manifestly disregarded the law. We affirm the district court.

## BACKGROUND

¶3 In August 2017, Jill Taylor filed for divorce from her husband, David Taylor. Jill and David stipulated to joint legal and physical custody of their two children but were unable to agree on, among other things, alimony, child support, and the appropriate division of their assets.

¶4 David wanted to resolve the parties' remaining issues by the end of 2018 so that he could avoid changes to the tax treatment of alimony that were slated to take effect the following year. To expedite a resolution, David asked Jill to attend arbitration in lieu of trial. Jill obliged, and the parties signed an arbitration agreement. The agreement provided that the Utah Uniform Arbitration Act (UUAA) would apply. *See* UTAH CODE §§ 78B-11-101 to -131. The agreement also named a retired district court judge as the arbitrator.

¶5 The parties engaged in an arbitration process that saw the arbitrator meet with each party separately and repeatedly. The arbitrator reviewed various expert reports as well as documents that detailed the parties' employment history, earnings, and job prospects.

¶6 To determine Jill's income, the arbitrator reviewed evidence regarding Jill's past employment in finance and pharmaceutical sales. He also reviewed a report David's vocational expert prepared that detailed wage estimates for various jobs available to Jill based on Jill's qualifications and prior work experience. The arbitrator also spoke with Jill, who explained that she was currently working as an aide in the Park City School District and that she intended to seek employment as an elementary school teacher once she had completed her degree in elementary education.

¶7 After considering the parties' positions and submissions, the arbitrator issued an award. Among other things, the arbitrator's award calculated alimony, set the amount of child support, and divided the parties' assets.

¶8 As part of that decision, the arbitrator estimated Jill's future income. The arbitrator concluded that "[Jill] should be allowed to work in the field of her choice—education, and she should be given time to complete her degree." He calculated Jill's income for 2019–2021 based on her salary as an aide and her ability to find work during the summer, and for 2022 according to her ability to secure a full-time teaching position once she had completed her degree. As to alimony, the arbitrator awarded Jill spousal support based on the parties' current financial situations and spending needs, including Jill's tuition costs.

¶9 A few months after the arbitrator issued the award, David moved the district court to correct three mathematical miscalculations. The district court made two of those corrections and entered the corrected award.

¶10 Less than two months later, David changed counsel and moved the district court to invalidate the entire arbitration award pursuant to section 78B-11-107 of the UUAA.[1] David argued that "[a]n arbitration agreement is not valid or binding in the divorce context" for three "well-defined" policy reasons.

---

[1] That section states, in relevant part: "An agreement contained in a record to submit to arbitration any existing or subsequent controversy arising between the parties to the agreement is valid, enforceable, and irrevocable except upon a ground that exists at law or in equity for the revocation of a contract." UTAH CODE § 78B-11-107(1).

¶11 David first claimed that arbitration interfered with a court's "inherent" and "nondelegable" authority to decide divorce issues. As David saw it, "[b]ecause parties cannot divest a court of jurisdiction by stipulati[on]" or delegation to a third party, it was necessarily true that they could not divest a court of jurisdiction by arbitration.

¶12 David next asserted that the UUAA permits modification of an arbitration award "only in . . . very limited circumstances," and such a "bar against modif[ication] . . . is flatly against the policy of ensuring that district courts retain ongoing jurisdiction to modify divorce-related rulings."

¶13 David additionally contended that the UUAA's limited appeal procedures impermissibly restrict the parties' statutory right to appeal the arbitrator's child support determination.

¶14 Alternatively, David asked the district court to vacate the arbitration award because the arbitrator manifestly disregarded the law—and thus exceeded his authority—when he calculated Jill's imputed income.[2] David claimed that Utah law requires the arbitrator to consider a list of factors when calculating the parties' incomes. *See* UTAH CODE § 78B-12-203(8)(b)(i)–(x). And David asserted that the arbitrator had substituted his "personal view" in place of those factors when he opined that Jill's income should be based on her desire "to work in the field of her choice."

¶15 David also argued that the arbitrator manifestly disregarded the law when he included Jill's tuition costs in the alimony budget. David contended that those costs were "not a part of the parties' standard of living during the marriage, nor [were they] a 'need,'" and were thus "the epitome of an unnecessary expense, given that [Jill was] intending to pay to attend school so that she may earn less than she already earns."

¶16 Jill moved the district court to confirm the arbitration award and enter a decree of divorce.

¶17 A court commissioner heard the parties' motions. The commissioner denied David's motion and granted Jill's. The commissioner concluded that contrary to David's position, public

---

[2] Under the UUAA, a party may move the court to vacate an arbitration award if the "arbitrator exceeded [her] authority." UTAH CODE § 78B-11-124(1)(d).

policy supports the arbitration of divorce cases. She reasoned that arbitration does not interfere with a court's continued jurisdiction because "[o]nce the arbitration award is reduced to a Decree of Divorce, the [c]ourt maintains jurisdiction to modify the decree based upon a material and substantial change in circumstances." The commissioner also concluded that "waiving the right to appeal is not contrary to law" because parties routinely waive their right to appeal "when the parties stipulate and a Decree of Divorce is entered."

¶18 As to David's claim that the arbitrator had manifestly disregarded the law, the commissioner determined that the arbitrator's calculation regarding Jill's income was "rational and evidence based." She explained that Utah law does not require a court to calculate income according to "the highest level." Rather, "[t]he imputation need[ed] to be reasonable and equitable," and "[i]t [was] not unreasonable to allow [Jill] to select a job that gives her a decent living rather than maximizing what a vocational evaluator opines." The commissioner also upheld the arbitrator's alimony award. The commissioner explained that "the standard of living during the marriage was such that [Jill] did not need to work full time." Therefore, "[t]he fact that tuition was provided so [Jill] could increase her earning potential, and that alimony was actually limited to the same time period as child support, was reasonable and equitable."

¶19 David asked the district court to overrule the commissioner's decision and made basically the same arguments he had included in his motion to invalidate or vacate the arbitration award.

¶20 The district court denied David's request to overrule the commissioner and confirmed the arbitration award. The court held that "Utah law does not preclude divorces from being arbitrated" for four reasons. The court first determined that "the plain language of the [UUAA] does not preclude divorce actions from being arbitrated," and "had the Utah legislature intended for divorce actions to be precluded from being arbitrated, it would have indicated so." The court next opined that the same public policies that favor arbitration in the civil context—"just, speedy, and inexpensive outcomes"—also "support parties being able to resolve their divorce cases in Utah via arbitration." The court stated that "[i]n fact, [David] invoked and relied on these policy considerations by proactively requesting to arbitrate this matter . . . as opposed to setting it for trial." The court further reasoned that "the plain language of the [UUAA] indicates that district court judges retain jurisdiction and the authority to vacate or amend arbitrations that run afoul of Utah law." Therefore, the court said, "[i]t follows that

for divorce cases that have been arbitrated, a district court . . . cannot change or amend arbitration awards if [it] merely disagree[s] with the arbitrator's findings and conclusions" but it can "vacate or amend arbitration awards that contain provisions that run contrary to established Utah law." The court finally concluded that even if "any substantive appellate rights are waived" by participation in arbitration, that waiver "is not contrary to Utah law, as Utah law indicates that there are various procedures wherein parties may agree to pursue expedited outcomes of their matters in exchange for giving up certain appellate rights."

¶21   The district court also concluded that the arbitrator had not manifestly disregarded the law. The court determined that "[the arbitrator]'s method of imputing [Jill]'s income complied with Utah law." The district court reasoned that Utah law required the arbitrator to calculate Jill's income by considering the relevant statutory factors, which, according to the court, "do[] not define 'employment potential and probable earnings' as being the equivalent of the highest or maximum amount of salary that a party could attempt to obtain" and "recognize[] that a parties' 'employment potential and probable earnings' encompass[] more considerations than just salary calculations for any given job." And the court held that the arbitrator had "effectively considered and applied the pertinent statutory factors" and "was not unreasonable" in permitting Jill to work in the field of her choice, which would allow for "more stable and ongoing" employment than if the arbitrator "require[d] [Jill] to work a job in a field that she had not been working in for many years."

¶22   Additionally, the district court opined that "[the arbitrator]'s alimony determinations" also "complied with Utah law." The court reasoned that the arbitrator acted in accordance with the statute when he based the alimony award on expenses, such as Jill's tuition costs, that "existed at the time of the arbitration." The district court also noted that the arbitrator had "limited [David]'s alimony obligation—i.e., . . . [he] did not order an alimony award for the length of the marriage, nor did [he] order that the alimony award . . . remain the same regardless of [Jill]'s efforts to obtain employment as a teacher."

¶23   "In sum," the district court concluded, "[the arbitrator]'s findings and decisions regarding [Jill]'s imputed income and the alimony award were informed, reasonable, equitable, and complied with Utah law." David appeals.

**STANDARD OF REVIEW**

¶24 "In reviewing the order of the district court confirming, vacating, or modifying an arbitration award, we grant no deference to the court's conclusions of law, reviewing them for correctness." *Softsolutions, Inc. v. Brigham Young Univ.*, 2000 UT 46, ¶ 12, 1 P.3d 1095; *see also Westgate Resorts, Ltd. v. Adel*, 2016 UT 24, ¶ 9, 378 P.3d 93 ("When we hear an appeal from a district court's review of an arbitration award, . . . we review the district court's interpretation of the UUAA . . . for correctness, without deference to its legal conclusions.").

**ANALYSIS**

**I. THE DISTRICT COURT CORRECTLY DENIED DAVID'S MOTION TO INVALIDATE THE ARBITRATION AWARD**

*A. Utah Law Does Not Permit David to Contest the Validity of the Arbitration Agreement After He Participated in Arbitration Without Objection*

¶25 David asks us to reverse the district court, set aside the arbitration agreement and award, and "order the district court to conduct a regular divorce trial."

¶26 Section 78B-11-107 of the UUAA, the provision on which David hangs his appeal, states in pertinent part: "An agreement contained in a record to submit to arbitration any existing or subsequent controversy arising between the parties to the agreement is valid, enforceable, and irrevocable except upon a ground that exists at law or in equity for the revocation of a contract." UTAH CODE § 78B-11-107(1).

¶27 David reads section 78B-11-107 to mean that a matter is not eligible for arbitration if there is "a ground that exists at law or in equity for the revocation of a contract." David argues that if a matter is not eligible for arbitration, the parties' arbitration agreement—and any arbitration award flowing from that agreement—is invalid.

¶28 "When interpreting a statute, our primary objective is to ascertain the intent of the legislature," "[t]he best evidence" of which "is the plain language of the statute itself." *McKitrick v. Gibson*, 2021 UT 48, ¶ 19, 496 P.3d 147 (alteration in original) (citations omitted). "[W]e read the plain language of the statute as a whole[] and interpret its provisions in harmony with other statutes in the same chapter and related chapters." *State v. Bess*, 2019 UT 70, ¶ 25, 473 P.3d 157 (alterations in original) (citation omitted).

¶29 By its plain language, section 78B-11-107 speaks to the "valid[ity], enforceab[ility], and irrevocab[ility]" of an arbitration agreement. *See* UTAH CODE § 78B-11-107(1). Section 78B-11-107 establishes the standard by which a court may judge—or the parties may contest—the existence of a "valid, enforceable, and irrevocable" arbitration agreement. But while section 78B-11-107 instructs us on how to assess the validity of an arbitration agreement, it does not speak to what to do with an arbitration award.

¶30 Other sections of the UUAA, however, do tell us what to do when a party challenges an arbitration award. *Cf. Jenkins v. Percival*, 962 P.2d 796, 799–800 (Utah 1998) (explaining that "[s]eparate parts of an act should not be construed in isolation from the rest of the act," and "constru[ing]" two sections of the UUAA "in tandem so as to give full effect to the intended scope of the Act" (citation omitted)). UUAA section 78B-11-123, for instance, explains that a court must confirm an arbitration award "unless the award is modified or corrected . . . or is vacated" pursuant to the grounds set forth in section 78B-11-124. One of those grounds permits a court to vacate an arbitration award "if[] . . . there was no agreement to arbitrate, *unless* the person [contesting the award] participated in the arbitration proceeding without raising an objection [as to lack or insufficiency of notice] not later than the beginning of the arbitration hearing." UTAH CODE § 78B-11-124(1)(e) (emphasis added).

¶31 David does not argue, in the words of section 78B-11-124(1)(e), that "there was no agreement to arbitrate." He instead argues that the arbitration agreement, though existing, is invalid. Stated differently, David contends that section 78B-11-124(1)(e) does not govern his challenge because he had an agreement to arbitrate, just not a valid one. This argument elevates form over function. An argument that there is no arbitration agreement differs in degree, but not kind, from an argument that there is no valid arbitration agreement. Therefore, when a party seeks to set aside an arbitration award by contesting the validity of the arbitration agreement, that claim must be analyzed under the strictures of section 78B-11-124(1)(e).

¶32 Importantly, then, if a party participates in arbitration without proper objection, she is unable to challenge the resulting arbitration award for want of a valid arbitration agreement.[3] Section

---

[3] We are not alone in concluding that a party may not contest the validity of an arbitration agreement after participating in arbitration

(continued . . .)

78B-11-107 is simply not a mechanism that allows a party to see what result she gets in arbitration before deciding to contest the validity of the arbitration agreement.

¶33 David did not object to arbitration. He asked for it. And without proper objection, *see id.* § 78B-11-124(1)(e), David cannot rely on section 78B-11-107 to invalidate the arbitration award. [4]

---

without objection. In *Cecala v. Nationsbank Corp.*, for example, a former employee "voluntarily initiated" arbitration of her claims against her employer. No. 3:00MC39-MU, 2001 WL 36127812, at *1 (W.D.N.C. Apr. 4, 2001), *aff'd*, 40 F. App'x 795 (4th Cir. 2002). After the arbitrator issued an award in favor of the employer, the employee moved to vacate the award, arguing that the arbitration agreement "she voluntarily signed" was invalid. *Id.* at *2. "The court [found] that having voluntarily initiated and actively participated in the arbitration proceedings at issue, as well as having failed to properly and timely object to the enforceability of the arbitration agreement, [the employee] ha[d] waived her right to contest the validity of the arbitration agreements." *Id.*; *see also Bayscene Resident Negotiators v. Bayscene Mobilehome Park*, 18 Cal. Rptr. 2d 626, 632 (Ct. App. 1993) ("[A] party who questions the validity of the arbitration agreement may not proceed with arbitration and preserve the issue for later consideration by the court after being unsuccessful in the arbitration."); *MBNA Am. Bank, N.A. v. Giron*, No. 28,775, 2010 WL 3971712, at *4 (N.M. Ct. App. Jan. 7, 2010) ("[T]he ability to continue arguing that there was no agreement to arbitrate allowed by [New Mexico's equivalent of section 78B-11-124(1)(e)] is limited to those instances in which the party objects that there is no valid agreement to arbitrate *before* participating in the arbitration hearing." (emphasis added)).

[4] David argues that the parties' arbitration agreement is contrary to public policy. Because David's argument is grounded only in section 78B-11-107, it fails for the reasons we explained above. We note, however, that in *Buzas Baseball Inc. v. Salt Lake Trappers, Inc.*, we seemed to sanction a separate, non-statutory "public policy exception" that is a "judicially created ground for vacating an arbitration award." 925 P.2d 941, 951 (Utah 1996). Under that exception, a court may disturb an award if it violates "a well-defined and dominant policy against the [described conduct] after a review of the relevant laws and legal precedents." *Id.* (alteration in original) (citation omitted) (internal quotation marks omitted). In *Ahhmigo,*

(continued . . .)

### B. *Divorce Cases Are Arbitrable*

¶34 David lost the chance to contest the arbitration agreement and award when he participated in arbitration without objection, and so we affirm the district court's denial of David's motion to invalidate. But we recognize that even if we were to reach the merits of David's argument, it would still fail.

¶35 David argues that the UUAA and Utah divorce law conflict such that divorce cases are not eligible for arbitration. He claims that family code and case law impose a "nondelegable duty" on district courts to make and modify final decisions regarding alimony, property division, child support, and custody. David contends that this is incompatible with the UUAA, which, according to David, "does *not* allow a court to supplant its own judgment for that of the arbitrator" and "does *not* allow ongoing jurisdiction for modification." And he asks us to resolve this conflict by concluding that the "more particular" divorce law prevails over "the general Arbitration Act." *See, e.g.*, *Lyon v. Burton*, 2000 UT 19, ¶ 17, 5 P.3d 616 ("[A] statute dealing specifically with a particular issue prevails over a more general statute that arguably also deals with the same issue.").

¶36 Jill claims there is no conflict between divorce law and the UUAA. As she reads it, "[t]he plain language of the [UUAA] shows that there is nothing in the statute to indicate that divorce cases should be precluded from arbitration." Jill also argues, among other things, that the UUAA does not divest a district court of its authority to ensure that arbitration awards are equitable and based in law and that family code expressly preserves a court's continuing jurisdiction to modify a divorce decree.

¶37 We begin our analysis "by looking at the plain language of the statute[s] because it is 'the best evidence of legislative intent.'" *Rosser v. Rosser*, 2021 UT 71, ¶ 42, 502 P.3d 294 (citation omitted). "Our first undertaking in this regard is to assess the language and structure of the statute[s]." *State v. Rushton*, 2017 UT 21, ¶ 11, 395

---

*LLC v. Synergy Co. of Utah*, we questioned the adoption of a ground for vacatur not explicitly expressed in statute. *See* 2022 UT 4, ¶ 40, 506 P.3d 536; *see also infra* Part II. But while we reaffirm our skepticism about adding substantive provisions to the UUAA that do not already exist, we need not comment on the exception's ultimate viability because David does not argue for its application.

P.3d 92. In so doing, "[w]e presume that the legislature used each word advisedly, and that the expression of one [term] should be interpreted as the exclusion of another . . . ." *Bountiful City v. Baize*, 2021 UT 9, ¶ 42, 487 P.3d 71 (second alteration in original) (citation omitted) (internal quotation marks omitted).

¶38 The UUAA governs the arbitration process in Utah. *See* UTAH CODE § 78B-11-101 to -131. It "applies to *any* agreement to arbitrate made on or after May 6, 2002."[5] UTAH CODE § 78B-11-104(1) (emphasis added). The UUAA further states that "[a]n agreement . . . to submit to arbitration *any* existing or subsequent controversy arising between the parties to the agreement is valid, enforceable, and irrevocable except upon a ground that exists at law or in equity for the revocation of a contract." *Id.* § 78B-11-107(1) (emphasis added). More simply put, the UUAA applies to "*any* agreement to arbitrate" "*any* existing or subsequent controversy arising between the parties to the agreement." *Id.* §§ 78B-11-104(1), 107(1) (emphases added); *see also Miller v. USAA Cas. Ins. Co.*, 2002 UT 6, ¶ 33, 44 P.3d 663 ("Under the [UUAA], parties can agree to arbitrate any controversy."). The UUAA does not expressly exempt any action or issue, including those related to divorce, from its provisions. Thus, by the UUAA's plain language, the Taylors' agreement to arbitrate certain aspects of their divorce—alimony, property division, and child support—falls into the category of "any agreement to arbitrate."

¶39 Neither Utah's family code nor case law, moreover, squarely addresses the arbitrability of divorce issues. Utah Code section 30-3-10.9—the only section of our family code in which the word "arbitration" appears—states that divorcing parents must include in their parenting plan "[a] process for resolving disputes," such as "counseling," "mediation or arbitration by a specified individual or agency," or "court action." UTAH CODE § 30-3-10.9(3)(a)–(c). That section also states that "the district court has the right of review from the dispute resolution process." *Id.* § 30-3-10.9(4)(f). But while the code seemingly allows divorcing parties to submit "future disputes" over the provisions of a parenting plan to non-binding arbitration, it

---

[5] The UUAA also "applies to any agreement to arbitrate made before May 6, 2002, if all the parties to the agreement or to the arbitration proceeding agree on the record." UTAH CODE § 78B-11-104(2).

does not explicitly forbid—or permit—parties from agreeing to arbitrate their divorces.

¶40 David argues that plain language, by itself, does not answer the question. And he credibly points to sections of Utah family law that seem to conflict with the provisions of the UUAA dealing with vacatur and modification. He argues that these conflicts require us to conclude that it is contrary to public policy for divorcing parties to submit their alimony, property division, child support, and custody-related disputes to arbitration.

¶41 We take David's point. A plain language look at the UUAA and our family code spotlights two statutory schemes that do not speak to each other. The Legislature could have spelled out, either in the UUAA or our family code, if, when, and what portions of a divorce may be submitted to arbitration. It did not. But that does not end our inquiry.

¶42 "If," after looking at plain language, "there is doubt or uncertainty as to the meaning or application of the provisions" at issue, *Osuala v. Aetna Life & Cas.*, 608 P.2d 242, 243 (Utah 1980), "we attempt to construe [the provisions] in harmony, and such that 'effect is given to every provision,'" *I.M.L. v. State*, 2002 UT 110, ¶ 26, 61 P.3d 1038 (citations omitted); *see also Field v. Boyer Co.*, 952 P.2d 1078, 1081 (Utah 1998) ("[I]t is the Court's duty to harmonize and reconcile statutory provisions, since the Court cannot presume that the legislature intended to create a conflict." (citation omitted)). We accomplish this task by "analyz[ing] the [statutes] in [their] entirety, in the light of [their] objective, and . . . in accordance with the legislative intent and purpose." *Osuala*, 608 P.2d at 243 (footnote omitted). In other words, we try to read the statutes together in a way that best keeps faith with what the Legislature wanted those statutes to accomplish.

1. The UUAA Provisions Limiting Judicial Review Did Not Prevent the Taylors from Submitting Their Divorce Issues to Arbitration

¶43 The first area of potential conflict David highlights is the ability of the district court to disregard an arbitration award before it is entered. David contends that our divorce law demands that a district court retain final authority to reject an agreement between the parties or input by a third party "based on equity."[6] David

---

[6] David cites Utah Code sections 30-3-5 and 30-3-10 as support for his claim that "[d]istrict courts are tasked with making

(continued . . .)

claims that the UUAA, in contravention of divorce law, confines a district court's authority to disturb an arbitration award to the "limited circumstances" laid out in section 78B-11-124. In other words, David argues that in the divorce context, an agreement between the parties or input by third parties can only constitute a recommendation to the district court, whereas under the UUAA, they are binding and difficult to set aside.

¶44 As an initial matter, we note the strong state policies underlying both the UUAA and Utah divorce law. As to arbitration, our law has long "favor[ed] arbitration as a speedy and inexpensive method of adjudicating disputes" and "easing court congestion." *Robinson & Wells, P.C. v. Warren*, 669 P.2d 844, 846 (Utah 1983); *accord Giannopulos v. Pappas*, 15 P.2d 353, 356 (Utah 1932). We have held that "judicial review of arbitration awards should not be pervasive

---

determinations in the first instance regarding alimony, child support, custody, property division, and debts." Section 30-3-5 speaks, in part, to the types of orders a court "may" or "shall include" in a divorce decree. UTAH CODE § 30-3-5(1), (2) (2018), *amended by and renumbered as* UTAH CODE § 30-3-5(2), (3), (4) (2022). It also sets forth a court's considerations "[i]n determining parent-time rights of parents and visitation rights of grandparents," *id.* 30-3-5(5)(a) (2018), *amended by and renumbered as* UTAH CODE § 30-3-5(7)(a) (2022), and "in determining alimony," *id.* § 30-3-5(8)(a) (2018), *amended by and renumbered as* UTAH CODE § 30-3-5(10)(a) (2022). Section 30-3-10 speaks to when a court must enter "an order of custody and parent-time" and the factors the court "may consider" in making such an order. *Id.* § 30-3-10(1), (2). While these provisions spell out what a court may or shall do, it does not necessarily follow that the Legislature intended these sections to be a statement, as David claims, that only district courts may make determinations regarding alimony, property division, child support, and custody, regardless of what the parties might otherwise have agreed upon. David also cites to case law, which he reads to preclude parties from delegating divorce-related decisions to an arbitrator. *See, e.g., Callister v. Callister*, 261 P.2d 944, 946 (Utah 1953); *Reese v. Reese*, 1999 UT 75, ¶ 25, 984 P.2d 987; *In re E.H.*, 2006 UT 36, ¶¶ 26–27, 137 P.3d 809. None of those cases, however, address whether parties can agree to arbitrate their divorces. So, while these sources may shed some reflected light on the arbitrability of divorce-related disputes, they do not speak directly to whether parties can submit their disputes to a neutral third party for adjudication.

in scope or susceptible to repetitive adjudications," but rather "strictly limited to the statutory grounds and procedures for review." *Robinson & Wells*, 669 P.2d at 846; *see also Buzas Baseball, Inc. v. Salt Lake Trappers, Inc.*, 925 P.2d 941, 947 (Utah 1996) ("A trial court faced with a motion to vacate or modify an arbitration award is limited to determining whether any of the very limited grounds for modification or vacatur exist."); *Duke v. Graham*, 2007 UT 31, ¶ 8, 158 P.3d 540 ("A district court's review of an arbitration award should be narrowly confined to those grounds established by statute."). "As a general rule," therefore, "an arbitration award will not be disturbed on account of irregularities or informalities in the proceeding or because the court does not agree with the award as long as the proceeding was fair and honest and the substantial rights of the parties were respected." *DeVore v. IHC Hosps., Inc.*, 884 P.2d 1246, 1251 (Utah 1994).

¶45 Utah family law is likewise driven by strong public policy. Foremost among these is the bedrock understanding that equity should prevail when a marriage dissolves. *See* UTAH CODE § 30-3-5(1) (2018), *amended by and renumbered as* UTAH CODE § 30-3-5(2) (2022) ("When a decree of divorce is rendered, the court may include in the decree of divorce *equitable* orders." (emphasis added)); *see also Iverson v. Iverson*, 526 P.2d 1126, 1127 (Utah 1974) ("[A]ll aspects of proceedings in divorce matters are equitable . . . ."); *Lord v. Shaw*, 665 P.2d 1288, 1291 (Utah 1983) ("A divorce action is highly equitable in nature . . . ."). When making divorce-related decisions, therefore, a district court is generally given "broad discretionary powers" to craft an equitable result. *Despain v. Despain*, 610 P.2d 1303, 1305–06 (Utah 1980); *see also* UTAH CODE § 30-3-5(8)(e) (2018), *amended by and renumbered as* UTAH CODE § 30-3-5(10)(d) (2022) (requiring a court to "consider all relevant facts and equitable principles" in determining alimony).

¶46 David correctly points out that we have held that an agreement between the parties serves only as a recommendation to the district court. *See, e.g.*, *Callister v. Callister*, 261 P.2d 944, 946, 948–49 (Utah 1953) ("[A]n agreement or stipulation between parties to a divorce suit . . . is not binding upon the court in entering a divorce decree, but serves only as a recommendation. . . . [T]he law was intended to give courts power to disregard the stipulations or agreements of the parties in the first instance and enter judgment . . . as appears reasonable . . . ."). And he contends that "[b]ecause parties cannot divest a court of jurisdiction by stipulating to an agreement, it follows that they cannot divest a court of jurisdiction by delegating that task to . . . an arbitrator."

¶47 Those cases stand for the proposition that parties cannot insulate stipulations they make regarding property division and alimony from judicial review. And we stand by that law. But we conclude that, in the absence of an express statutory prohibition, when divorcing parties make an informed and voluntary decision to submit their alimony and property-related disputes to a neutral third-party arbitrator under the UUAA, the strong policies allowing parties to choose to arbitrate their disputes overtake those policies favoring more robust judicial review.[7]

¶48 Arbitrations concerning alimony and division of marital property do not differ substantially from the types of cases that are routinely arbitrated. *See, e.g., HITORQ, LLC v. TCC Veterinary Servs., Inc.*, 2021 UT 69, 502 P.3d 281 (compelling arbitration of a claim for dissolution of a veterinary clinic); *Harold Selman, Inc. v. Box Elder Cnty.*, 2011 UT 18, 251 P.3d 804 (concluding that the Ombudsman's Office has statutory authority to arbitrate an ownership dispute between private property owners and Box Elder County); *Shipp v. Peterson*, 2021 UT App 25, 486 P.3d 70 (reinstating an arbitration award granting life insurance proceeds to listed beneficiary). In both camps of cases, adult parties—often aided by counsel—agree to have a neutral third party decide what is equitable. The policies favoring equitable decision-making that animate our family law do not disappear, but that work is outsourced to a neutral third party. And safeguards remain in place to revisit the outcome of the arbitration if the process is, among other things, tainted by fraud, corruption, or misconduct, or if the arbitrator exceeds her authority. *See* UTAH CODE § 78B-11-124(1).

¶49 Put another way, while we continue to recognize our state's policy in favor of ensuring that an arbitration award addressing alimony or marital property is equitable, we do not find that policy to be so strong as to require us to treat divorcing spouses— particularly those represented by counsel—differently from other parties who want to arbitrate their disputes. Therefore, until the Legislature amends one or the other of those statutory schemes to provide otherwise, we see no reason to revoke the trust we place in

---

[7] To be clear, we are just addressing agreements to arbitrate property division and alimony. As we explain below, when it comes to issues involving children, a district court must maintain the independent authority to review an arbitration award to ensure it is in the best interests of the child. *See infra* ¶¶ 54–62.

arbitrators to decide a property dispute between two parties, dealing at arm's length and capable of contracting, just because those parties are (or were) married. We thus conclude that nothing in the Utah family code prevents parties from agreeing to arbitrate their alimony and property disputes under the UUAA. Nor does any provision of the family code conflict with allowing the parties to agree to limit judicial review of the resulting award to those grounds given in section 78B-11-124 of the UUAA. *See* UTAH CODE § 78B-11-124(1).

¶50  Other courts have reached similar conclusions. The Supreme Court of New Jersey, for example, has concluded that "parties may bind themselves in separation agreements to arbitrate disputes over alimony." *Faherty v. Faherty*, 477 A.2d 1257, 1262 (N.J. 1984). The court explained, "It is fair and reasonable that parties who have agreed to be bound by arbitration in a formal, written separation agreement should be so bound. Rather than frowning on arbitration of alimony disputes, public policy supports it." *Id.* In line with this reasoning, the *Faherty* court held that "[a]s is the case with other arbitration awards," an award addressing alimony is subject to the limited judicial review provided in its arbitration act. *Id.*

¶51 The Idaho Court of Appeals has, for many of the same reasons, decided that when divorcing parties submit their property-related disputes to arbitration, "judicial review of the award . . . is distinctly limited" to the statutory grounds provided in its arbitration act. *Hughes v. Hughes*, 851 P.2d 1007, 1009 (Idaho Ct. App. 1993). The *Hughes* court saw no difference between arbitration agreements between spouses and arbitration agreements between other parties who "have decided to substitute the final and binding judgment of an impartial entity conversant with the business world for the judgment of the courts." *Id.* (citation omitted). And it held these agreements to the same standard: "Having chosen to submit the property division question to an arbitrator for resolution, the parties limited their recourse for judicial review." *Id.* at 1009–10; *see also Kelm v. Kelm*, 623 N.E.2d 39, 41–42 (Ohio 1993) (pointing out its past "recogni[tion]" of "the validity and enforceability of agreements to arbitrate in many areas of the law," as well as "the benefits of arbitration," and "see[ing] no reason why" agreements to arbitrate domestic relations matters, including agreements to arbitrate alimony, "should not be included"); *Miller v. Miller*, 620 A.2d 1161, 1163–64 (Pa. Super. Ct. 1993) (determining that "parties should be able to settle their domestic disputes out of court," and that "parties who have agreed to arbitrate should be bound by that decision"); *Kovacs v. Kovacs*, 633 A.2d 425, 432 (Md. Ct. Spec. App. 1993) (holding that arbitration awards regarding "alimony and property

issues, if otherwise valid," may "be adopted without further consideration"); *Bandas v. Bandas*, 430 S.E.2d 706, 708 (Va. Ct. App. 1993) (noting that "[n]owhere in the Uniform Arbitration Act, as adopted by Virginia, are courts required to review an arbitration agreement in a domestic relations context with more scrutiny than other disputes" and thus restricting judicial review of arbitration agreements in domestic relations cases to "the standard set forth" in its Uniform Arbitration Act).

¶52 While we wait for further legislative clarity, we join these jurisdictions in concluding that divorcing parties may agree to subject their alimony and marital property disputes to the benefits and limitations of the UUAA.

¶53 The outcome changes in the child support and custody context. By statute, these issues are determined by the best interest of the child. *See* UTAH CODE § 30-3-5(5)(a) (2018), *amended by and renumbered as* UTAH CODE § 30-3-5(7)(a) (2022); *id.* § 78B-12-210(3). We have stated that parties may not agree to divest a district court of its responsibility to ensure that decisions concerning child support and custody are in the best interests of the child.

¶54 In *In re E.H.*, for example, "[w]e granted certiorari to consider the custody of a young boy, E.H.," in light of a stipulation between E.H.'s biological mother and adoptive parents "assigning a psychologist the task of making recommendations concerning E.H.'s best interests." 2006 UT 36, ¶¶ 1, 3, 137 P.3d 809. We considered, specifically, "whether the stipulation . . . was an impermissible delegation of authority to a third party." *Id.* ¶ 3.

¶55 We explained that while "the law favors the settlement of disputes," *id.* ¶ 20, "there are certain agreements that so compromise the core responsibilities of the court that they cannot be honored," *id.* ¶ 21. And we concluded,

> The stipulation between the mother and the adoptive parents did not unconstitutionally strip the district court of core functions because the district court did not surrender to [the psychologist] its authority to enter a custody order. Rather, the court merely agreed to follow a process for the determination of the best interests of E.H. and to uphold this process so long as it adequately served that end.

*Id.* We thus "ultimately upheld the stipulation because the parties' arrangement 'adequately served [the] end' of determining E.H.'s best interest and the district court had 'satisf[ied] itself that [the

psychologist]'s recommendations were properly arrived at.'" *R.B. v. L.B.*, 2014 UT App 270, ¶ 14, 339 P.3d 137 (alterations in original) (quoting *In re E.H.*, 2006 UT 36, ¶¶ 21, 28). "[We] further held that even when the parties in a custody dispute agree to be bound by an evaluator's findings, the district court retains 'the ultimate authority to preside over the proceedings, to satisfy itself that [the evaluator's] recommendations were properly arrived at, and to enter a final order.'" *Id.* (second alteration in original) (quoting *In re E.H.*, 2006 UT 36, ¶ 28).

¶56 Following *In re E.H.*'s lead, the court of appeals has concluded "that parties cannot stipulate away the district court's statutory responsibility to conduct a best-interest analysis." *Id.* ¶ 16. The court of appeals observed that "Utah law has recognized that in the context of a child's well-being, interests in finality rank below the child's welfare," and that "[t]he same logic applies to judgments predicated on stipulated agreements." *Id.* ¶ 17; *see also Cox v. Hefley*, 2019 UT App 60, ¶ 26, 441 P.3d 769 (reaffirming *R.B.*).

¶57 There is another reason why, absent express legislative authorization, arbitration awards dealing with child custody and support must be seen as non-binding recommendations to the district court. "Arbitration agreements are creatures of contract." *Createrra, Inc. v. Sundial, LC*, 2013 UT App 141, ¶ 8, 304 P.3d 104. As such, arbitration agreements "bind only those who bargain for them." *Bybee v. Abdulla*, 2008 UT 35, ¶ 8, 189 P.3d 40. And Utah law does not permit a parent to bargain away their child's right to have a district court decide the child's best interests.

¶58 Under Utah law, for example, "a parent cannot release his or her minor child's prospective claims for negligence." *Rutherford v. Talisker Canyons Fin. Co.*, 2019 UT 27, ¶ 15, 445 P.3d 474 (reaffirming our decision in *Hawkins ex rel. Hawkins v. Peart*, 2001 UT 94, 37 P.3d 1062, *superseded by statute*, UTAH CODE § 78B-4-201 to -203, *as stated in Penunuri v. Sundance Partners, Ltd.*, 2013 UT 22, 301 P.3d 984). Taking cues from "Utah law provid[ing] various checks on parental authority to ensure a child's interests are protected," and from the absence of any law "granting parents in Utah a general[,] unilateral right to compromise or release a child's existing causes of action without court approval or appointment," we reasoned that preinjury releases for negligence signed by a parent on behalf of a minor child violate "public policies favoring protection of minors with respect to contractual obligations." *Hawkins*, 2001 UT 94, ¶¶ 11, 12.

¶59 The Superior Court of Pennsylvania has voiced similar concerns about divorcing parents contracting away a child's right to

have a court review decisions affecting the child's best interest. In line with these concerns, that court concluded that a trial court must be able to ensure that an arbitrator's custody determinations are in the best interest of the child. *Miller v. Miller*, 620 A.2d 1161 (Pa. Super. Ct. 1993). The superior court opined,

> Parties to a divorce action may bargain between themselves and structure their agreement as best serves their interests. They have no power, however, to bargain away the rights of their children. Their right to bargain for themselves is their own business. They cannot in that process set a standard that will leave their children short. Their bargain may be eminently fair, give all that the children might require and be enforceable because it is fair. When it gives less than required or less than can be given to provide for the best interest of the children, it falls under the jurisdiction of the court's wide and necessary powers to provide for that best interest. It is at best advisory to the court and swings on the tides of the necessity that the children be provided. To which the *inter se* rights of the parties must yield as the occasion requires.

*Id.* at 1165–66 (quoting *Knorr v. Knorr*, 588 A.2d 503, 505 (Pa. 1991) (addressing agreements between parents concerning child support)); *see also Kovacs*, 633 A.2d at 431 (concluding that "the chancellor's responsibility to ensure the best interests of the children supersedes that of the parents" and requiring a chancellor to determine that an arbitrator's decision is in the best interests of the child before entering it).

¶60 The Supreme Court of New Jersey has also recognized that "[t]he right of parents to the care and custody of their children is not absolute." *Fawzy v. Fawzy*, 973 A.2d 347, 358 (N.J. 2009) (alteration in original) (citation omitted). "Indeed," the court noted, "the state has an obligation, under the *parens patriae* doctrine, to intervene where it is necessary to prevent harm to a child." *Id.* at 358–59 (footnote omitted). Relying on this doctrine, the court concluded that while "the right to arbitrate child custody and parenting time serves an important family value," the review of an arbitration award is subject to judicial review beyond "the confines of [New Jersey's] Arbitration Act" when "there is a claim of adverse impact or harm to the child." *Id.* at 360–61. Notably, New Jersey's harm standard poses "a significantly higher burden than a best-interests analysis," requiring a party to allege a level of harm akin to "grant[ing]

custody to a parent with serious substance abuse issues or a debilitating mental illness." *Id* at 361.

¶61 We note that some states have expressed these concerns and come out differently. The Supreme Court of South Carolina, for instance, has concluded that "arbitration of children's issues is not permitted." *Singh v. Singh*, 863 S.E.2d 330, 334 (S.C. 2021). The *Singh* court explained that "[l]ongstanding tradition of this state places the responsibility of protecting a child's fundamental rights on the court system," and that "[p]arents may not attempt to circumvent children's rights to the protection of the State by agreeing to binding arbitration with no right of judicial review."[8] *Id.*; *see also Kelm*, 749 N.E.2d at 301–03 (allowing arbitration of child support issues, but not of custody issues because it "advances neither the children's best interests nor the basic goals underlying arbitration").

¶62 Harmonizing the statutory schemes and recognizing the strong policies underlying the protection of children and the UUAA leads us to a decision like that reached in Pennsylvania and New Jersey—agreements to arbitrate child support and custody are not contrary to public policy. But any award that flows from these agreements must be in the best interests of the child. A district court retains the authority to ensure that an arbitration award addressing child support or custody satisfies the best-interests standard and may hear a challenge to the arbitration award on that basis.[9]

2. A Court Retains Continuing Jurisdiction to Modify an Arbitration Award in a Divorce Case Pursuant to Utah Code Section 30-3-5

¶63 David also argues that the UUAA and Utah divorce law conflict in another area—modification. David contends that under the UUAA, a district court can modify an arbitration award "only under limited circumstances involving minor procedural, mathematical, or factual errors, and can only do so within ninety

---

[8] The *Singh* decision was also based on the court's reading of its Alternative Dispute Resolution Rules, which, the court concluded, "implicitly limit[ed] binding arbitration to issues of property and alimony." 863 S.E.2d at 333.

[9] Had David argued that the arbitrator's decision on child support was not in the best interests of the children, our conclusion might have triggered a remand. But at no point—either before the district court or on appeal—has David argued that the arbitration award was contrary to the children's best interests.

days." "But in the divorce context, district courts must retain jurisdiction *forever* to enter modified decrees 'as is reasonable and necessary' or 'based on a substantial change in circumstances,' or when the 'best interests' of the child so require." (Citations omitted.) (Internal quotation marks omitted.)

¶64 As David points out, the UUAA indicates that a court may modify or correct an arbitration award for only those reasons it sets forth. *See* UTAH CODE § 78B-11-125. Family code, on the other hand, provides that a district court retains continuing jurisdiction to modify any divorce-related orders. Specifically, Utah Code section 30-3-5 states that a court "has continuing jurisdiction to make subsequent changes or new orders for the custody of a child and the child's support, maintenance, health, and dental care, and for distribution of the property and obligations for debts as is reasonable and necessary." *Id.* § 30-3-5(3) (2018), *amended by and renumbered as* UTAH CODE § 30-3-5(5) (2022); *see also id.* § 78B-12-210(9)(a) (2008), *amended by* UTAH CODE § 78B-12-210 (2022). Under that same section, a court also "has continuing jurisdiction to make substantive changes and new orders regarding alimony based on a substantial material change in circumstances not foreseeable at the time of the divorce." *Id.* § 30-3-5(8)(i)(i) (2018), *amended by and renumbered as* UTAH CODE § 30-3-5(11)(a) (2022) (stating that a court has continuing jurisdiction to make such changes and new orders "based on a substantial material change in circumstances not expressly stated in the divorce decree or in the findings that the court entered at the time of the divorce decree"). Under our family code, therefore, a divorce court "retains continuing jurisdiction over the parties, and power to make equitable redistribution or other modification of the original [divorce] decree as equity might dictate." *Despain*, 610 P.2d at 1305; *see also Potts v. Potts*, 2018 UT App 169, ¶ 13, 436 P.3d 264 ("[D]ivorce courts are well established as courts of equity that retain jurisdiction over the parties and subject matters for the purposes equity may demand." (citation omitted)).

¶65 We considered the trial court's powers to modify a divorce decree in *Barraclough v. Barraclough*, 111 P.2d 792 (Utah 1941) (per curiam). There, a divorcing couple "entered into a written stipulation" setting alimony. *Id.* at 792 (internal quotation marks omitted). The trial court granted the divorce and based the alimony award on the parties' stipulation. *Id.* at 792–93. Five months later, one of the parties "petitioned the lower court to modify the decree as to alimony." *Id.* at 793 (internal quotation marks omitted). The trial court denied the petition, "determin[ing] that the 'stipulation' . . . constituted 'a lump sum, complete and final settlement of all

alimony . . ., and that such settlement ha[d] become a final judgment as to alimony." *Id.*

¶66 We reversed the trial court. We explained,

> In a divorce action the trial court should make such provision for alimony as the present circumstances of the parties warrant, and any stipulation of the parties in respect thereto serves only as a recommendation to the court. If the court adopts the suggestion of the parties it does not thereby lose the right to make such modification or change thereafter as may be requested by either party based on some change in circumstances warranting such modification.

*Id.*; *see also Jones v. Jones*, 139 P.2d 222, 224 (Utah 1943) (concluding that the ability of a divorce court to modify an alimony award based upon the parties' stipulation "can no longer be considered an open question in this State" under *Barraclough*).

¶67 The court of appeals has relied, in part, on our holding in *Barraclough* to conclude that even a "non-modification provision [does] not divest the court of its continuing jurisdiction" to modify a divorce decree. *Sill v. Sill*, 2007 UT App 173, ¶ 9, 164 P.3d 415. In *Sill v. Sill*, "the parties reached a stipulation and property settlement agreement," under which the parties agreed to monthly alimony and "the division of real and personal properties." *Id.* ¶ 3. "The trial court approved the Agreement and incorporated its provisions into the parties' . . . divorce decree." *Id.* ¶ 4. Later, one of the parties sought to modify the decree by "reduc[ing] the amount of alimony he agreed to pay." *Id.* ¶ 5. The trial court dismissed the petition, concluding that "both parties had waived the right to modify any terms of the Agreement." *Id.* ¶¶ 5–6.

¶68 To examine the effect of the parties' non-modification provision, the court of appeals first turned to Utah Code section 30-3-5 and noted "the significance of the legislature's inclusion of the adjective 'continuing' to refer to the court's jurisdiction." *Id.* ¶ 10. The court next turned to supreme court case law, noting that we had repeatedly held that "parties cannot by contract divest a court of its statutorily granted subject matter jurisdiction to make alimony modifications, even if the parties intend the alimony provisions to be nonmodifiable." *Id.* ¶¶ 12–14, 17. "[C]onsidering section 30-3-5[]'s continuing jurisdiction language and Utah case law," the court of appeals determined that the trial court had erred when it dismissed the petition to modify. *Id.* ¶ 17; *see also Cox*, 2019 UT App 60, ¶ 30

(concluding under *Sill*, that a "third party neutral's decisions regarding parent-time" are subject to modification).

¶69 Harmonizing the statutory schemes, we conclude that even when parties agree to arbitrate their divorce-related dispute, they are entitled to seek modification of the resulting award "as is reasonable and necessary," UTAH CODE § 30-3-5(3) (2018), or "based on a substantial material change in circumstances," *id.* § 30-3-5(8)(i)(i) (2018).[10]

¶70 To summarize, divorcing parties may agree to submit their alimony, property, child support, and custody-related disputes to arbitration. Judicial review of a resulting arbitration award, moreover, is limited to only those grounds provided in the UUAA, except when the arbitration award covers child support and custody. In those cases, a district court has the independent responsibility to ensure that the award is in the best interests of the child. Once an award is entered in the form of a decree of divorce, the entire decree is subject to modification as Utah Code section 30-3-5 provides.

¶71 We emphasize that the conclusions we reach today follow from our best efforts to harmonize two statutory schemes that do not talk directly to each other. And we recognize that our Legislature is best equipped to break the silence between the statutes. We note in this regard that the Uniform Law Commission has approved a Uniform Family Law Arbitration Act (UFLAA), which has been adopted in a handful of states. *See Family Law Arbitration Act*, UNIF. L. COMM'N, https://www.uniformlaws.org/committees/community-home?CommunityKey=ddf1c9b6-65c0-4d55-bfd7-15c2d1e6d4ed (last visited May 13, 2022); *see also* MONT. CODE ANN. § 40-16-101 to -128; N.D. CENT. CODE § 32.29.4.-01 to -26; HAW. REV. STAT. § 658j-1 to -27; ARIZ. R. FAM. LAW P. 67.2.

¶72 Under the UFLAA, parties may agree to submit any "family law dispute" to arbitration, UNIF. FAM. L. ARBITRATION ACT § 5, with a few exceptions, *id.* § 3(b) (clarifying that the UFLAA "does not authorize an arbitrator" to grant a divorce, terminate parental rights, grant an adoption or guardianship, or determine the status of a child in need of protection). As to the grounds on which a court can modify or vacate an arbitration award prior to confirmation, the

---

[10] In his motion before the district court, David argued that divorce cases are not eligible for arbitration for a third reason: the UUAA limits a party's right to appeal an arbitrator's decision. David does not pursue this argument on appeal, and we do not address it.

UFLAA tracks the UUAA, *compare id.* §§ 17, 18(a), 19(a)(1)–(7), *with* UTAH CODE §§ 78B-11-121(1), -124(1)(a)–(f), -125(1), with one important distinction—a court can modify or vacate an award "determin[ing] a child-related dispute" when the award "is contrary to the best interests of the child," UNIF. FAM. L. ARBITRATION ACT § 19(b), (c). A court can also modify an award "based on a fact occurring after confirmation" in accordance with the arbitration agreement or state law. *Id.* § 22.

¶73 Other states have enacted their own statutes authorizing family law arbitration. *See* MICH. COMP. LAWS § 600.5071; N.C. GEN. STAT. § 50-41(a); N.M. STAT. ANN. § 40-4-7.2(A). In states with statutes allowing arbitration of a child-related dispute, an award on the topic is generally subject to modification or vacatur when the award is adverse to the best interests of the child. *See* GA. CODE. ANN. § 19-9-1.1; TEX. FAM. CODE ANN. § 153.0071(b); MICH. COMP. LAWS § 600.5080(2); N.C. GEN. STAT. § 50-54(a)(6); N.M. STAT. ANN. § 40-4-7.2(T); *see also* COLO. REV. STAT. § 14-10-128.5 (authorizing "[a]ny party . . . to move the court" to conduct a "de novo hearing" to modify an arbitration award "concerning the parties' minor or dependent children"); *but see* FLA. STAT. § 44.104(14) (prohibiting parties from arbitrating "any dispute involving child custody, visitation, or child support"). These statutes also generally allow for modification of a confirmed arbitration award in accordance with state rules or statutes. *See, e.g.*, MICH. COMP. LAWS § 600.5080(3); N.C. GEN. STAT. § 50-56.

## II. THE ARBITRATOR DID NOT MANIFESTLY DISREGARD THE LAW

¶74 David next argues that "[a]t a minimum, the award should be vacated because the arbitrator exceeded his authority by manifestly disregarding Utah law." David claims that the arbitrator manifestly disregarded the law when he imputed Jill's income and included Jill's tuition costs in the alimony award.

¶75 Our case law has recognized that a court may vacate an arbitration award "if [the arbitrator's] decision demonstrates a manifest disregard of the law." *Westgate Resorts, Ltd. v. Adel*, 2016 UT 24, ¶ 10, 378 P.3d 93. But we have since called *Westgate's* conclusion into question. *See Ahhmigo, LLC v. Synergy Co. of Utah*, 2022 UT 4, 506 P.3d 536.

¶76 In *Ahhmigo*, we explained that the manifest disregard standard had its genesis in United States Supreme Court dicta. *Id.* ¶ 26 (discussing *Wilko v. Swan*, 346 U.S. 427, 436–37 (1953)). In later

cases, SCOTUS declined to comment on the standard's survival, *see Hall St. Assocs. v. Mattel, Inc.*, 552 U.S. 576, 585–87 (2008); *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 672 n.3 (2010), "creat[ing] a split among jurisdictions as to whether the manifest disregard standard remains a viable ground for vacatur" under the Federal Arbitration Act, *Ahhmigo*, 2022 UT 4, ¶ 28 (citing cases).

¶77 *Ahhmigo* also addressed the standard's precarious position in our case law. *Id.* ¶¶ 31–36. We observed that "we have never applied the standard to vacate an arbitration award." *Id.* ¶ 37. We also explained that "we have been less than clear when we have talked about the link between the manifest disregard standard and the UUAA," *id.* ¶ 38—that is, "we [could not] say whether the manifest disregard standard operates as only a gloss on section 78B-11-124(1)(d) of the UUAA, or whether it is a standalone ground on which a court may vacate an arbitration award," *id.* ¶ 40. Looking to "each of the grounds for vacatur" under the UUAA, we "wonder[ed] if perhaps manifest disregard of the law is better thought of as a way of sussing out whether the arbitrator exceeded her authority in a manner that deprived the parties of the benefit of their bargain." *Id.* ¶¶ 41, 43. "At the very least," we "view[ed] with suspicion a standard that permits a party to ask a district court to vacate an award based upon what is, in essence, an argument that the arbitrator misapplied the law dressed up as an argument that the arbitrator disregarded the law." *Id.* ¶ 45.

¶78 *Ahhmigo* notwithstanding, neither party has asked us to abandon the manifest disregard standard. And so we proceed to apply the standard under our case law as it currently sits.

¶79 "'[M]anifest disregard' is an extremely deferential standard." *Westgate Resorts*, 2016 UT 24, ¶ 11. To meet this standard, a party must prove three elements:

> First, the [arbitrator]'s decision must actually be in error. Second, the error "must have been obvious and capable of being readily and instantly perceived by the average person qualified to serve as an arbitrator." Third, the [arbitrator] must have "appreciate[d] the existence of a clearly governing legal principle but decide[d] to ignore or pay no attention to it."

*Id.* (third and fourth alterations in original) (citation omitted).

¶80 David first argues that the arbitrator manifestly disregarded the law when he calculated Jill's imputed income. David claims that the arbitrator failed to "consider the significant money that [Jill] will

25

be able to earn from investing her property division." And he contends that the arbitrator based Jill's income "not on the statutory factors, but on his own judgment that [Jill] should be allowed to work in the field of her choice . . . and given time to complete her degree."

¶81  Utah Code specifies that imputation of income for alimony or child support purposes must "be based upon employment potential and probable earnings." UTAH CODE § 78B-12-203(8)(b). "In evaluating a spouse's 'employment potential and probable earnings,' courts are instructed to consider, among other factors, available employment opportunities, the spouse's health and relevant work history, and 'prevailing earnings and job availability for persons of similar backgrounds in the community.'" *Bond v. Bond*, 2018 UT App 38, ¶ 7, 420 P.3d 53 (citing UTAH CODE § 78B-12-203(8)(b)(i)–(x)).

¶82 David cannot successfully demonstrate that the arbitrator manifestly disregarded the law when he calculated Jill's income because he does not show that the arbitrator's decision was "actually . . . in error," let alone that any error in the arbitrator's decision was "obvious and capable of being readily and instantly perceived by the average person qualified to serve as an arbitrator." *Westgate*, 2016 UT 24, ¶ 11 (citation omitted).

¶83  We first note, as the district court did, that Utah law does not require the arbitrator to impute Jill's income according to her highest historical salary or possible property investments. It requires, instead, that the arbitrator consider an array of factors and impute Jill's income based on her "employment potential and probable earnings." *See* UTAH CODE § 78B-11-203(8)(b). And contrary to David's assertion, the arbitrator did not ignore this framework. As the district court found, the arbitrator "effectively considered and applied the pertinent statutory factors." Specifically, the arbitrator considered Jill's employment history in the financial and pharmaceutical sales sectors and a report submitted by David's vocational expert listing various jobs available to Jill based on her skillset and prior work experience. The arbitrator also spoke with Jill, who explained that while she was currently working as an aide, she was in the process of completing a degree in elementary education and intended to secure a full-time teaching position once her degree was complete. Considering all of these factors, the arbitrator imputed Jill's income. The arbitrator thus did not manifestly disregard the law.

¶84  David also argues that the arbitrator manifestly disregarded the law when he "provid[ed] a line-item in [Jill's] alimony budget for

her to obtain the education necessary to work in [the teaching] profession." He contends that Utah Code instructs courts to calculate alimony according to a spouse's "needs" and "the standard of living existing at the time of separation." According to David, Jill's tuition costs were "neither part of the parties' standard of living during the marriage nor a 'need.'"

¶85  When determining alimony, a district court must consider a series of factors, including "the financial condition and needs of the recipient spouse." UTAH CODE § 30-3-5(8)(a)(i)–(vii) (2018), *amended as and renumbered by* UTAH CODE § 30-3-5(10)(a)(i)–(vii) (2022). In accordance with those factors, "[a]s a general rule, the court should look to the standard of living, existing at the time of separation." *Id.* § 30-3-5(8)(e) (2018), *amended as and renumbered by* UTAH CODE § 30-3-5(10)(e) (2022). "However, the court shall consider all relevant facts and equitable principles and may, in the court's discretion, base alimony on the standard of living that existed at the time of trial." *Id.*

¶86  We again find no "obvious" error in the arbitrator's decision. The arbitrator determined that Jill's tuition costs constituted a component of Jill's "financial condition" and spending "needs," and factored those costs into the standard of living that existed at the time of arbitration. This is expressly sanctioned by Utah law. *See id.* § 30-3-5(8)(a)(ii), (e).

¶87  Ultimately, while David may disagree with the arbitrator, that does not equate to manifest disregard. After all, manifest disagreement and manifest disregard are different. *See Pac. Dev., L.C. v. Orton*, 2001 UT 36, ¶ 15, 23 P.3d 1035 (refusing to vacate an arbitration award for manifest disregard of the law because "[the appellant]'s manifest disregard argument simply amount[ed] to a 'manifest disagreement' with the arbitrator's findings and final award" (citation omitted)).

## CONCLUSION

¶88  David asked his then-wife, Jill, to submit to arbitration the parties' disputes regarding alimony, property division, and child support. Jill agreed. David now asks us to invalidate the award under section 78B-11-107 of the UUAA. He argues that the plain language and policies of our state's arbitration and divorce laws conflict such that the parties' arbitration agreement is unenforceable.

¶89  But having participated in arbitration without objection, David lost the chance to rely on section 78B-11-107 to contest the arbitration award in his divorce case. We also reject David's argument that Utah law prevents parties from submitting at least some aspects of their divorce action to arbitration. Judicial review of

arbitration awards dealing with divorce-related issues, however, varies depending on the issue and its underlying policies. Parties may arbitrate questions concerning alimony and property division and agree to the limited judicial review the UUAA contemplates. The strong policies underlying statutory provisions ensuring the protection of children, on the other hand, dictate that a court maintain the ability to consider whether an arbitration award addressing child support or custody is in the best interests of the child.

¶90 Concerning modification, a court retains continuing jurisdiction to modify orders relating to property distribution or children "as is reasonable and necessary," UTAH CODE § 30-3-5(3) (2018), *amended by and renumbered as* UTAH CODE § 30-3-5(5) (2022), and orders relating to alimony "based on a substantial material change in circumstances," *id.* § 30-3-5(8)(i)(i) (2018), *amended by and renumbered as* UTAH CODE § 30-3-5(11)(a) (2022).

¶91 David alternatively asks us to invalidate the arbitration award for manifest disregard of the law. Even assuming that standard remains viable, it has not been met. We affirm the district court.

―――――――――